THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONALD E. GIVENS *et al.*, Defendants-Appellants.

First District (5th Division)   No. 76-397

Opinion filed March 11, 1977.

James J. Doherty, Public Defender, of Chicago (James L. Rhodes and Marc Fogelberg, Assistant Public Defenders, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a bench trial defendants were found guilty of armed robbery and defendant Tillman was also found guilty of unlawful use of weapons. Each was sentenced to serve 5 to 10 years in the penitentiary for armed robbery and Tillman was given a concurrent sentence of 1 to 3 years for unlawful use of weapons. On appeal defendants contend that they were not proved guilty of armed robbery beyond a reasonable doubt and that their respective 5 to 10 year sentences for this offense are excessive. Additionally, Tillman contends that he was not proved guilty of unlawful use of weapons beyond a reasonable doubt. We affirm.

Enrique Limon testified at trial that he was walking south on Hoyne Avenue in the City of Chicago on February 22, 1974, at approximately 10:30 a.m. It was snowing hard and because the snow fell toward him he walked with his head down, looking at the ground, as he approached the

intersection of 21st Street and Hoyne Avenue. Suddenly he heard someone say: "This is a hold up." He looked up and saw a gun pointing at him and two men facing him. A tall man stood in front of him and held the gun about 12 inches from his face. Limon identified this man as Givens. A short man stood a couple of yards away to his right. Limon identified this man as Tillman. Givens said, "I will blast your head if you don't turn the money in." Limon stated that he didn't have any money and Givens responded by hitting him in the head a couple of times with the gun. Tillman then went into Limon's right front pants pocket and took his wallet. Thereafter defendants ran east toward Damen Avenue. As they fled one of them took Limon's money from the wallet and then threw the empty wallet on the sidewalk. Limon followed, retrieved his wallet, and then continued his pursuit and kept them in view until they reached a gas station located at the intersection of Damen Avenue and Cermak Road. He encountered a uniformed policeman sitting in a marked squad car at the same intersection. He reported the robbery to the policeman and lost sight of his assailants while talking to the officer. Two plainclothes men in an unmarked police car were also present at the intersection. Although Limon did not speak to them, they left to search for the assailants after Limon reported the robbery. Limon then got in the squad and accompanied the uniformed policeman in a search for the assailants. The squad circled the block and then pulled into the gas station at the intersection of Damen and Cermak. Limon looked across Damen Avenue and saw Givens in a parked car and Tillman outside of the same car. After spotting them he said to the officer: "Those are the fellows that just hold [sic] me up." He then got out of the squad and walked across the street toward the parked car. The policeman followed in the squad. After the officer reached the vicinity of the car he asked Limon: "Are those the men?" Limon said, "Yes, sir." Thereupon the officer went up to the car, ordered Givens out and placed defendants under arrest. A gun was recovered from the car and shown to Limon. At this point in the trial Limon was asked if he had ever seen this gun before it was taken from the car. He answered that he had seen it when he was robbed and that Givens had held it in front of his face. When the question was repeated Limon said that it looked like the gun used in the robbery; but when asked to repeat his answer Limon said he had seen it during the robbery and that Givens was the robber who held it. Following this exchange, Limon testified that he had been robbed of $43, and that Givens was wearing a red hat with the letters "JB" on it at the time of the robbery.

During cross-examination Limon testified that about three minutes elapsed from the time the pistol was first put in his face to the time that both assailants turned and ran with his wallet. He saw both men during this period. He looked from one man to the other but he never took his

eyes off the pistol. The gun was held at eye level and as he looked at it he also looked past it into Givens' face. However, despite the fact that nothing covered Givens' face Limon did not remember any of Givens' facial characteristics; nor did he remember what type of clothing Givens wore. The assailants had their backs to him as they fled and he was not able to see their faces during their flight. Upon entering the squad he described his assailants as two colored men, one weighing around 180 pounds and the other around 145. The only additional descriptive statement he made to the police was that one of the men had a red and white hat on. When asked to recall preliminary hearing testimony in which he stated that the only description he gave of his assailants was that one was tall and the other was short, Limon stated that he remembered so testifying. Limon and the officer searched for his assailants for four or five minutes before he observed them about a block from the scene of the robbery. During this period he could not see the two men. Ten minutes elapsed from the beginning of the robbery until Limon spotted defendants across the street from the gas station. He misunderstood a question asked at the preliminary hearing to which he responded that he had lost sight of the defendants for 10 minutes. When he first saw defendants and the car across the street, the passenger door was open and Tillman was outside of the car, "getting in his seat, cleaning the seat" on the passenger's side. Limon remembered testifying at the preliminary hearing that the officer had asked: "Are those the men?" for the first time while they sat in the squad at the gas station and that he answered: "I want to be sure." He explained that this was the correct account of what he had said. When he first saw the men across the street falling snow prevented a positive identification. After responding "I want to be sure," he got out of the squad and walked across the street toward defendants. The officer followed him and again asked: "Are those the men?" At this point Limon responded: "Yes, sir." Following this explanation Limon testified that two detectives arrived in an unmarked car after his assailants were arrested. He saw a search conducted but did not notice whether anything was taken from either defendant.

On redirect examination Limon confirmed that he looked at both men during the robbery and that it occurred in about three minutes. He also observed that while Tillman was now bald, on the day of the robbery Tillman had hair.

On recross examination Limon was asked to recall preliminary hearing testimony in which he said that the robbery had occurred in "two or three" minutes. Limon admitted saying something like that at the hearing but explained that he didn't have a watch.

Chicago Police Sergeant Eugene Golden testified at trial that he was on duty in uniform and in a marked police car at about 10:30 a.m. on

February 22, 1974. At that time he sat in his squad before a stop light at the intersection of Cermak Road, otherwise known as 22nd Street, and Damen Avenue. Two plainclothes men sat in an unmarked police car to his right. Limon came up to his squad and reported a robbery. He asked Limon where it had taken place and who did it. Limon replied that two colored men had robbed him up at the next corner and pointed west. The plainclothes men were present during this conversation. Limon entered the squad and Sergeant Golden proceeded to search for the assailants. The plainclothes men also left. While touring the area he asked Limon for additional descriptive information. Limon said one robber was a tall fellow over six feet tall, the other was about five foot eight and one of them wore a stocking cap with red "JB" letters on it. After circling the block Sergeant Golden parked in a gas station on the southeast corner of 22nd and Damen. A green, four-door, 1968 Chevrolet was parked at the curb on the other side of Damen facing south. It was snowing at the time but his vision was not obstructed and he clearly saw the car and two men across the street. Limon, who sat in the front seat of the squad, said: "There they are," and pointed to the two young colored men across the street. Sergeant Golden asked, "Are you sure?" and without answering Limon jumped out of the squad and ran across the street. Thereupon the officer drove west across Damen toward the two men and stopped two or three feet from their car. As he drove across the street he observed one of the men Limon pointed to in the vehicle's driver's seat and the other on the passenger's side "about ready to get in the car." He identified Givens as the man seated in the vehicle and Tillman as the man standing outside. He exited from his squad, drew his gun and told the two men that they were under arrest. He noticed that Givens was wearing a stocking cap with red "JB" lettering. He had called for help and the two plainclothes men that had been stopped at the light alongside him when Limon first ran up arrived at this time. These officers searched the defendants. They recovered four shotgun shells from Givens. They also searched the 1968 vehicle and Sergeant Golden saw them recover a pistol and a sawed-off shotgun from this auto. Defendants were then transported to the police station. About five minutes elapsed between the time Limon first spoke to him and Limon's first identification of defendants as the assailants.

During cross-examination Sergeant Golden testified that he did not recall Limon saying: "I want to be sure." Instead, his recollection was that the victim had simply said: "That's them," and then jumped out of the squad. No shotgun shells were recovered from Tillman and the officer never saw Tillman in the car. However, he did see Tillman standing on the sidewalk, "just entering the car."

Investigator Friedlieb testified at trial that he was on duty with his partner in plainclothes and in an unmarked police car on February 22,

1974. At approximately 10:30 a.m. on that date he was stopped at the light at Damen and Cermak. Limon ran up and stood between his car and Sergeant Golden's squad. He got out of his car and overheard the conversation between Limon and Sergeant Golden. He heard the officer ask Limon what had happened and Limon's reply that he had just been held up. When asked for a description of the assailants Limon replied that two male Negroes, one tall and one short, had held him up. He and his partner then left and Limon got in the squad and left with Sergeant Golden. A few minutes later he heard the sergeant calling for assistance. He ceased his tour of the area and responded to the call. Only three or four minutes passed from the time he first saw Limon to the time he heard the call. As he approached the intersection of Damen and Cermak he observed a squad in the middle of Damen Avenue, Sergeant Golden standing near two men with his gun out, the two men standing near a green 1968 Chrysler, and Limon standing near the squad. He identified defendants as the two men held at gunpoint. He also noticed that Givens wore a black hat with red "JB" lettering. Upon arrival at the scene Sergeant Golden said: "These are the guys," and Investigator Friedlieb read the defendants their rights. He believed he then asked Tillman who owned the 1968 vehicle and that Tillman responded that it was his car. The investigator then searched Givens and recovered four 12-gauge shotgun shells. He proceeded to handcuff Givens and search the Chrysler. He recovered a sawed-off shotgun whose barrel was less than 18 inches in length and a .38-caliber automatic pistol whose clip held seven rounds of ammunition from under the passenger's side of the front seat. Both weapons had been completely hidden from view by the seat. He then took defendants to the police station. There he searched both defendants and found $20 on Givens and $23 on Tillman.

Defendant Givens testified at trial that around 4 a.m. on February 22, 1974, it was snowing and the car he and Tillman were traveling in broke down. Both men left the car parked on Cermak and went to a police station about a block away in order to make a phone call. There they remained, waiting out the storm and awaiting the opening of a nearby gas station, until about 10:30 a.m. Givens then went to the car to see if it would start. Tillman left the police station at the same time and went to the gas station to purchase some gas. The car had been left open and Givens got in upon reaching it and awaited Tillman's arrival. Tillman returned with gas in a can. The police arrived, pulled the men from the car, searched them and placed them under arrest.

During cross-examination Givens again stated that he left the police station and went to the car to see if he could get it started, but he also testified that Tillman had the car keys. He admitted having four shotgun shells in his possession but denied owning the car, the pistol and the

shotgun. Nor did he know that either weapon was in the car, how they got there or who owned them, but he knew that Tillman's father owned the car. He did not own a knit cap with "JB" lettering and he was not wearing such a cap on February 22, 1974. The $20 recovered from him that day was not part of the $43 taken from Limon and he did not rob Limon.

The pistol, its ammunition, the sawed-off shotgun, the shotgun shells taken from Givens, and the $43 recovered from defendants were all admitted into evidence.

## I

The first issue presented on appeal is whether Tillman was in constructive possession of the sawed-off shotgun found under the passenger's side of the stalled vehicle's front seat. Tillman argues that no one saw him inside the stalled vehicle, that no shotgun shells were recovered from him, that the shotgun was at least as accessible to Givens as it was to himself, and that he did not make any motion toward the shotgun; hence his knowledge of the weapon's presence in the car and his immediate and exclusive control over the car cannot be inferred. It follows, he contends, that he was not proved guilty of unlawful use of weapons beyond a reasonable doubt.

■■ ■ "A person commits the offense of unlawful use of weapons when he knowingly * * * possesses * * * any shotgun with a barrel less than 18 inches in length * * *." (Ill. Rev. Stat. 1973, ch. 38, par. 24—1(a)(7).) To apply the doctrine of constructive possession of such a weapon the evidence must show that the defendant had immediate and exclusive control over the area where the weapon was found and must be such that his knowledge of the presence of the shotgun may be inferred. (See *People v. Zentz* (1975), 26 Ill. App. 3d 265, 266, 325 N.E.2d 40; *People v. Nunez* (1974), 24 Ill. App. 3d 163, 167-69, 320 N.E.2d 462.) The presence of other persons in the area where such a weapon is found does not necessarily negate the inference of constructive possession arising from such evidence. (See *People v. O'Neal* (1975), 35 Ill. App. 3d 89, at 91, 341 N.E.2d 36.) In the case at bar, the victim testified that he saw Tillman outside of the car on the passenger's side "cleaning the seat." He also stated that Tillman was "getting in his seat." Sergeant Golden testified that Tillman was "about ready to get in the car," and was "just entering the car," but was not inside the car. Investigator Friedlieb testified that he found the shotgun under the front seat on the passenger's side and he believed he asked Tillman whose car it was and that Tillman said it was his car. Givens testified that Tillman had the car keys and that Tillman's father owned the car. Obviously, possession of the car keys gave Tillman control over the car's use as a moving vehicle. Furthermore, the evidence indicates that either Tillman owned the car, or his father

owned it. If Tillman owned the car, he had authority to use it. If his father owned the car, it seems reasonable to believe that Tillman obtained its keys from his father. Thus, even if Tillman's father owned the car, it seems safe to conclude that Tillman had the authority to use it. The trial judge could have reasonably concluded from the testimony either (1) that Tillman was seen cleaning the seat under which the shotgun was hidden and that part of his body was positioned over that portion of the seat which hid the shotgun, or (2) that Tillman was observed in the process of getting in the car and sitting on that portion of the seat which hid the shotgun from view. We believe that these circumstances establish both Tillman's knowledge of the shotgun's location and his immediate and exclusive control over the automobile in which it was found. Moreover, under the circumstances of this case we do not believe that Givens' presence in the driver's seat negates the inference of constructive possession. Therefore we hold that Tillman was proved guilty of unlawful use of weapons beyond a reasonable doubt.

## II

The second issue presented on appeal is whether defendants were proved guilty of armed robbery beyond a reasonable doubt. The defendants argue that the victim did not have an opportunity to observe his assailants sufficient to permit a positive identification. They also argue that certain evidence is not corroborative of their guilt.

Positive identification testimony of a victim who is credible and who had an ample opportunity to observe his assailants is sufficient to establish guilt beyond a reasonable doubt even though it is contradicted by the accused. See *People v. Williams* (1975), 60 Ill. 2d 1, 12, 322 N.E.2d 819; *People v. Novotny* (1968), 41 Ill. 2d 401, 411, 244 N.E.2d 182.

Limon positively identified defendants as the robbers at trial and never wavered in his identification. He also positively identified them approximately ten minutes after the robbery began. He gave conflicting accounts of his location when he made this identification. Sergeant Golden's testimony conflicts with one of these accounts. Nonetheless, from his inconsistent and conflicting testimony the trial judge could reasonably have concluded that Limon positively identified the defendants as the robbers soon after the robbery and at some point prior to their arrest. From the testimony in the case at bar the trial judge could also have reasonably concluded: (1) that the robbery took place in a two-to three-minute span of a late morning hour; (2) that Limon stood near his assailants, facing them, and that his eyes shifted focus between the gun, Givens' face and Tillman's face during this period but that all three remained within Limon's field of vision throughout the robbery; (3) that Limon at the very least described his assailants as one tall man and one

short man; and (4) that Limon therefore had an adequate opportunity to observe his assailants despite the snow, getting hit in the head a couple of times, the general nature of his description and the conflicting testimony as to what description he gave.

Concerning Limon's description, defendants vehemently argue that the lack of facial descriptions indicates the lack of an adequate opportunity to observe. However, it was not shown that either defendant had any prominent or unusual feature which would impress itself on the victim's mind. Also, his noticing that Tillman had become bald since the robbery supports the belief that Limon would have noticed something unusual about his assailants' faces if there was anything unusual about them to notice. Without a showing of a prominent or unusual facial feature and with an indication that the victim would have noticed such a feature had there been one, the inability to give facial descriptions does not by itself logically require the inference that the victim did not have a sufficient opportunity to observe; nor does this fact coupled with all of the other evidence make this inference the only reasonable one or make unreasonable the opposite, positive inference that there was an adequate opportunity.

In a bench trial it is the function of the trial judge to determine the credibility of the witnesses, the weight to be afforded their testimony and the inferences to be drawn from the evidence, including an inference concerning the adequacy of the victim's opportunity to observe his assailants, and a reviewing court should not substitute its judgment for that of the trial judge unless the evidence is so unsatisfactory, improbable or implausible as to justify a reasonable doubt of a defendant's guilt. (See *People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733; *People v. Zuniga* (1973), 53 Ill. 2d 550, 559, 293 N.E.2d 595; *People v. Clark* (1964), 30 Ill. 2d 216, 219, 195 N.E.2d 631; *People v. Donald* (1963), 29 Ill. 2d 283, 286, 194 N.E.2d 227; *People v. Woods* (1963), 26 Ill. 2d 582, 585, 187 N.E.2d 692, *cert. denied*, 374 U.S. 850, 10 L. Ed. 2d 1070, 83 S. Ct. 1913.) Accordingly, where the evidence is merely conflicting, *e.g.*, where there are minor variations or discrepancies in a witness' testimony or in the testimony of prosecution witnesses, and where a witness is unable to recollect or describe, a reviewing court will not substitute its judgments for those of the trier of fact concerning credibility, weight and inferences drawn from the evidence. See *Akis*, at 298-99; *People v. Bell* (1972), 53 Ill. 2d 122, 125-26, 290 N.E.2d 214; *People v. Robinson* (1964), 30 Ill. 2d 437, 440, 197 N.E.2d 45; *Clark*; *People v. Henderson* (1976), 36 Ill. App. 3d 355, 365-68, 344 N.E.2d 239; *People v. Kent* (1973), 15 Ill. App. 3d 523, 528, 305 N.E.2d 42.

■■ Concerning the corroborating evidence, defendants argue that Limon did not positively identify the pistol found in the car as the gun

used in the robbery. We disagree. Twice Limon said the gun recovered from the car was the gun used in the robbery and held by Givens. Once he said that it looked like the gun used in the robbery, and this statement fell between the others. We believe that this testimony constitutes a sufficient identification of the gun. See *People v. Daniels* (1976), 35 Ill. App. 3d 791, 797, 342 N.E.2d 809. See also *People v. Jones* (1961), 22 Ill. 2d 592, 597-601, 177 N.E.2d 112.

■■ While Limon was unable to give more than a general description of his assailants and his testimony contains some inconsistencies and conflicts on some points with that of the prosecution's other witnesses, after considering all of the evidence, including the corroborating evidence, we believe defendants were proved guilty of armed robbery beyond a reasonable doubt.

### III

The third issue presented on appeal is whether the 5 to 10 year sentences for armed robbery are excessive. Armed robbery is a felony for which an indeterminate sentence with a minimum of not less than 4 years must be given. (Ill. Rev. Stat. 1973, ch. 38, pars. 18—2(b), 1005—8—1(a) and (c)(2).) The Unified Code of Corrections provides that the maximum term for armed robbery shall be any term in excess of 4 years and the minimum term shall be 4 years unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher minimum term. (Ill. Rev. Stat. 1973, ch. 38, pars. 1005—8—1(b)(2) and (c)(2).) Thus the sentence imposed is within the statutory limits. Nonetheless, the defendants ask this court to exercise its authority under Supreme Court Rule 615(b)(4) to reduce the sentence. Ill. Rev. Stat. 1973, ch. 110A, par. 615(b)(4).

■■ A reviewing court should not reduce a sentence within statutory limits unless there is a substantial reason for doing so (see *People v. Morgan* (1974), 59 Ill. 2d 276, 282, 319 N.E.2d 764), that is, unless the sentence is greatly at variance with the purpose and spirit of the law or greatly disproportionate to the nature of the crime (*People v. Petty* (1975), 33 Ill. App. 3d 183, at 185, 337 N.E.2d 249; accord, *People v. Fox* (1971), 48 Ill. 2d 239, 251-52, 269 N.E.2d 720; *People v. Taylor* (1965), 33 Ill. 2d 417, 424, 211 N.E.2d 673). The imposition of a sentence is a matter of judicial discretion and the sentence imposed by the trial court should not be altered by a reviewing court unless it is apparent that the judge abused his discretion. (*People v. Burbank* (1972), 53 Ill. 2d 261, 275, 291 N.E.2d 161, *cert. denied*, 412 U.S. 951.) Further, we should exercise our authority to reduce sentences within the statutory limits with considerable caution and circumspection because the trial judge who heard the testimony, observed the defendants and heard the matters presented in

aggravation and mitigation is in a better position to determine the appropriate sentence. See *Morgan; Burbank; Fox; Taylor; Petty.*

Although the record discloses that defendants were both teenagers with no prior criminal record at the time of the robbery, the evidence shows that Limon's life was threatened and that he was beaten with a pistol. Thus we do not believe that the sentence imposed was greatly at variance with the purpose and spirit of the law or greatly disproportionate to the nature of the crime. We conclude that the trial court did not abuse its discretion and that this is not a proper case to exercise our power to reduce the sentence.

Accordingly, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.