THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LARRY HAYES *et al.*, Defendants-Appellants.

First District (5th Division)   No. 77-1377

Opinion filed March 16, 1979.—Rehearing denied April 25, 1979.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg, Assistant Public Defender, of counsel), for appellant Larry Hayes.

Cornelius E. Toole, of Chicago, for appellants Edward Murphy and George Wormley.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Iris E. Sholder, and Ira H. Raphaelson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

After a jury trial, defendants were convicted of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and each sentenced to 75 to 100 years. On appeal, the following issues are raised: (1) Whether defendants were found guilty of murder beyond a reasonable doubt; (2) whether the trial court committed reversible error by threatening a prosecution witness; (3) whether the trial court erred in admitting into evidence photographs of the murder scene; (4) whether defendant Hayes was denied a fair trial where members of the jury saw photographs which the trial court ruled were not to be displayed to the jury; (5) whether defendants were denied a fair trial when the assistant State's Attorney assumed facts during his rebuttal argument; and (6) whether defendant Hayes' sentence was excessive. We affirm on all points raised.

Patrice Freeman, who was 13 at the time of the incident in this case, testified that at around midnight on May 16, 1975, she was on an elevator with her friend, Joanne Jones, at 5201 South Federal, a high-rise public housing project. The elevator failed to stop on the fourth floor, where Freeman lived, and despite her efforts, it did not stop until it reached the fifteenth floor. They got off the elevator and began walking down the staircase to Freeman's apartment.

When they arrived at the fifth floor, they saw George Wormley, whom Freeman had known for about three years, standing about 80 feet from the laundry room on the fifth floor. Jones asked Wormley where she could find Larry Hayes, her boyfriend. He told her that Hayes had gone home. After he had said this, Hayes, whom Freeman had known for about a year, came walking down a large hallway. Wormley asked Jones to get a knife for him, but she refused and told him that she was staying with Hayes. He then asked Freeman to get the knife. When she asked him why he wanted the knife, he told her not to worry about it.

Freeman went to apartment 701 and asked a person named Wardell if she could use his knife. She told him that Wormley wanted to use it. When she went into his kitchen, he told her to bring the knife back. She took two knives which she described as "silver and curled at the end." She said that they were not sharp and were blunted at the end.

After she had obtained the knives, Freeman went back to the fifth floor. When she arrived, she saw Wormley, Hayes, and Edward Murphy, whom she had known for about three years. She noticed blood on their clothes and she testified that she thought that she saw blood on Wormley's shoes. She gave the knives to Wormley and asked him what he intended to do. He told her that they were "trying to kill a Stone." When he said that, she asked for the knives back because she did not want to get involved. However, Wormley said nothing. She then asked to see the boy before they did anything. She went into the laundry room with Jones and

saw the boy, later identified as Stanley Beck, lying face forward on the floor. She said that he was bloody and was naked from the waist down except for a sock which he was wearing. While she was there, the boy did not move or say anything, and she said that he "looked dead." While she was in the laundry room, Wormley, Hayes, and Murphy were outside, about six feet away from the door.

After seeing the boy, Freeman and Jones ran down to the fourth floor. Freeman could not get into her apartment, so she and Jones went out onto the porch area of the fourth floor. There they saw a boy talking to Freeman's aunt. Freeman told the boy that "they" were going to kill somebody. She refused to identify the boy at trial, but she did say that her aunt heard her tell the boy about the killing. She stated that even though she knew a number of people in the building, she did not ask anyone to call the police. She said that she and Jones remained on the porch for about 15 minutes and then began walking upstairs.

When they reached the sixth floor, Freeman and Jones heard Wormley, Hayes, and Murphy talking. They first saw them on the porch area outside apartment 610. One of them told Freeman and Jones not to say anything about what had happened. At some point, Hayes and Wormley tried to hand the knives back to Freeman, but she refused to accept them. She said that the knives had blood on them. After she had entered the apartment, one of them again told her not to say anything about what had happened. She said that she thinks that it was Hayes. She noticed that the three of them had changed most of their clothes and thought that they had taken off their shirts. She also noticed that both Wormley and Murphy were wearing the same kind of gym shoes which they were wearing when she had seen them on the fifth floor. She remained in the apartment for about five minutes and then left with Jones.

Freeman walked with Jones to her apartment at 5135 South Federal. When they arrived at the building, they met a boyfriend of Freeman's mother. He told Freeman to go back to the building. When she returned to 5201 South Federal, she saw her stepfather and mother but did not tell them what had happened. Also, she said that she did not call the police.

On May 18, 1975, Freeman first spoke to the police in her apartment in the presence of her mother, aunt, and friends. At that time, she told the police that she did not know anything about the boy in the laundry room. When asked if she ever had occasion to learn that her brother had been arrested and questioned about killing the boy in the laundry, she answered that she had not.

About a week after the incident, Freeman began a series of four or five visits to the police station. Upon separate questioning by counsel for each defendant, she testified to different dates for some of the visits, but

consistently testified that she had given two written statements to the police. She said that in each instance she was called to come over to the station by the police, and, although she travelled to the station on her own, after each visit the police drove her home. He mother was with her on all but one of the visits and whenever she was asked to give a written statement, her mother was present. Each visit began in the early or midafternoon and most visits lasted for at least four hours.

Freeman told the counsel for Hayes that she went to the police station on May 24, 1975, but that she did not tell the police anything about what had happened. She said that while she was there the police were mean to her and were yelling at her. They told her that they had a witness who said that she had borrowed two knives from him on the night that the boy was killed. They also told her that they could charge her with murder. She said that she was frightened and that she lied to the police because she was afraid of getting hurt. On redirect examination, she testified that she was afraid that she was going to be hurt by friends of Wormley, Murphy, and Hayes.

Freeman told counsel for Hayes that about four days after the first visit, she returned to the police station. Two of the police officers who questioned her on this occasion were Investigators Kehoe and Kennedy. She told them that she did not know anything about what had happened in the laundry room. They yelled at her and once again she was told that she could be charged with murder unless she told the truth. She gave them a written statement which made no mention of any involvement by Hayes in the events of May 16-May 17. After this visit, she returned to the police station on two or three other occasions.

Freeman also told the counsel for Hayes that she was called to testify before a grand jury in June of 1975. Prior to her appearance, she was taken into a small room where Investigator Kehoe again yelled at her. She then testified before the grand jury. When she came out of the grand jury room, Kehoe tried to serve her with a subpoena for her appearance at the trial of this case. She refused to accept the subpoena. After her refusal, there was more yelling and, eventually, Kehoe pushed her brother. She said that she agreed to testify only after the assistant State's Attorney agreed to move her mother out of the building at 5201 South Federal.

Freeman told counsel for Wormley that her first visit to the police station occurred about a week after she had seen the boy in the laundry room. She said that Investigators Kehoe and Kennedy questioned her in a small room for a number of hours. She said that she was afraid while she was being questioned because she "had to go home."

Freeman told counsel for Wormley that her next visit occurred around a week later. During that visit, she gave a written statement to the police. The statement essentially included the matters testified to at trial

by her. However, in that statement, she omitted mentioning anything about Hayes, her visit to apartment 610, or her seeing her stepfather on May 16 or May 17. She also stated that she had taken only one knife out of Wardell Robinson's apartment. She said that the police were not mean to her after she had given this statement. She testified that this statement was not the truth. On her third visit, which occurred more than three days after the second visit, she was asked to give another statement because the police did not believe that she told the truth in her first statement. This time she mentioned Hayes' involvement in the incident.

Freeman told counsel for Murphy that on May 24, 1975, the date of her first written statement, she told the police what she thought would get her out of the police station. She said that both she and her mother signed the statement. When she went home that night she told her stepfather that she had not told the police the truth, but he did not call the police and tell them that.

On May 27, she went back to the police station and told the police that the first written statement was not the truth. During this visit, she was questioned by Kehoe and Kennedy with her mother and boyfriend present. While she gave her second statement one of the officers typed it up. Then the officers read it back to her. She said that she had trusted that the officers had typed up what she had said. Both she and her mother signed the statement. In this statement, she stated that "King" had sent her for the knife and that she had brought the knife to him. She said that "King" was Larry Hayes. She testified that this was untrue. In her statement, she also stated that after he had received the knives, King said that he was going to kill "this fellow." She testified that she could not remember if that was true. When asked by Murphy's counsel whether she recalled testifying before the grand jury that she gave the knife to Larry, she said that she could not remember.

Linda Burnett testified that she lived in apartment 1202 at 5201 South Federal on May 16 and May 17, 1975. At around midnight on May 16, she arrived home with a number of her friends whom she did not wish to identify at trial. She said that she saw Patrice Freeman and some of her friends on the first floor of the building. Since both elevators were broken, Burnett and her friends had to walk up to her apartment. When they arrived on the sixth floor, they rested. While there, they saw a couple of people, including George Wormley and Edward Murphy. At first, she testified that she did not notice anything special about their clothes. However, upon further questioning by the assistant State's Attorney, she said, "I could have seen dirt spots, I could see dirt spots, I don't know what kind of spots you want for me to say." On cross-examination, she stated that the spots were larger than quarters and, although she first indicated that she could not say whether she saw more than one spot, she

subsequently stated that the spots were on more than one area of their clothing.

About a half hour later, Burnett heard a lot of noise on the fifth floor and she went down to see what was the cause of the commotion. When she arrived, she saw Wormley and Murphy standing by the elevators. The elevators were located just across from the laundry room. She also said that there could have been five more people on the fifth floor. They were standing apart, about 10 to 15 paces from Wormley and Murphy. She said that neither Wormley nor Murphy was doing anything unusual. One of them had a knife, but she thought that they were just playing around. When asked what type of shoes they were wearing, she said that they "could have been wearing gym shoes, could have been [wearing] shoes." After about 10 minutes, she left the fifth floor.

About four days later, Burnett was called to the police station to give a statement. She could not remember if the date of this visit was May 28, 1975, but she did say that she had only been to the police station on one occasion. She arrived at 8 or 8:30 p.m. and was questioned by Investigators Kehoe and Kennedy concerning the events of the night of May 16-May 17. Among other things, she told the investigators that she had not seen Larry Hayes on the night in question. She said that they tried to get her to change this statement, but she never changed the statement. One of the investigators typed up her statement and only one half hour after she had arrived, she signed it. She did not read the statement because she "believed that what [she] * * * was saying was typed down." After she had given her statement, she was kept in the police station until 1 or 2 a.m. During that time, the investigators repeatedly told her that she would be jailed until the trial unless she told them that she had seen Hayes. She testified that she never told them that she had seen Hayes on that night.

Eric Rogers testified that he was a schoolmate of Stanley Beck. He said that Beck was 14 years old on May 16, 1975, and he lived at 101st Street and Malta. He said that Beck's mother lived in the vicinity of 52nd Street and Federal. He had previously been in that vicinity with Beck. At around 11:30 p.m. on May 16, he was waiting with Beck for a northbound bus at 99th Street and Vincennes. Eventually, he left Beck at the bus stop and went home. It was stipulated that Rogers would identify People's Exhibit No. 5 as a photograph of Beck.

Essie Beck testified that she was Stanley Beck's mother. On May 16 and 17, she was living at 5201 South Federal. On May 21, she heard about Stanley from either her daughter or her sister.

Officer Richard Thompson, a mobile lab technician, testified that at approximately 2:25 p.m. on May 18, 1975, he went to the fifth floor laundry room at 5201 South Federal. The laundry room was divided into

three cubicles and, as far as he could remember, there was a light in the room. He found Stanley Beck's body in the south cubicle. Although the cubicles were divided by metal mesh partitions, the body was visible from the doorway. When he saw the body, it was in a state of decomposition. Thompson said that the victim was lying face forward in some garbage and burned debris. There was some burned garbage on top of the victim's stomach. There were blood spatterings on the floor and wall around the body. Also, Thompson stated that he saw a shoe, stocking, beer can, and length of wire on the floor near the victim. No weapons were found at the scene.

Thompson photographed the scene. He took a photograph of a shoe print which had been made in the blood. He described the print as "gym-shoe type," but stated that it was possible that other types of shoes could have left a similar impression. He measured the footprint with a scale but not with a "rule." He also attempted to take fingerprints but he was unable to find any suitable prints in the cubicle.

Joseph Claparols, a pathologist employed by the Coroner of Cook County, testified that he performed an autopsy on Stanley Beck on May 19, 1975. His external examination revealed that Beck had been dead for a period of time. Although his report, signed on June 5, indicated that the date of death was May 18, 1975, he said that he did not independently determine that date but was given the time when the victim was pronounced dead.

Claparols noted that the victim had suffered extensive burns to portions of his body and a number of severe lacerations and abrasions to the face, scalp, abdomen, scrotum, and perineum. He characterized many of the lacerations as "stab-like wounds." Two of the lacerations to the head caused fractures. Claparols stated that the fracture to the left eye region "could be associated with a perforating wound into the eye socket region," whereas, the fracture to the back of the head could be associated with a blunt instrument. Claparols testified further that the types of injuries which he observed would give rise to substantial bleeding. Also, he stated that wounds inflicted before death practically always evidence vital changes such as hemorrhaging.

Claparols' internal examination revealed several rib fractures. He also said that the skull evidenced wounds consistent with those found on the external examination. When asked for his opinion on the cause of death, he stated that the cause was craniocerebral injury, extreme.

At the close of the State's case, several exhibits were admitted into evidence. Also, it was stipulated that each defendant was 17 when arrested on May 28, 1975.

The defense only called two witnesses. Linda Burnett, called on behalf of defendant Hayes, was shown a statement which she identified as

the one which she signed for the police on May 28, 1975. She said that it was unusual that the statement mentioned Larry Hayes since she had not said anything about him to the police. She said that she had specifically told Investigators Kehoe and Kennedy that she had not seen Hayes on the night of May 16-May 17. She also stated that although the statement mentioned blood, she had never mentioned blood to the police or said that she had seen blood on Murphy and Wormley.

Eddie Freeman, Patrice Freeman's brother, was called on behalf of defendant Hayes but refused comment on any of the questions asked him.

At the close of the defense case, it was stipulated that on May 24, 1975, various items of clothing, including two pairs of gym shoes, were taken from Wormley and Murphy and tested for the presence of blood. The tests proved to be negative.

## OPINION

Defendants' first contention is that they were not proven guilty of murder beyond a reasonable doubt. In particular, defendants argue that they were convicted of murder solely on the basis of circumstantial evidence and that that evidence, as provided almost solely by the testimony of Patrice Freeman, was so contradictory and so impeached that it cannot sustain the conviction. Further, they argue that the State's failure to call certain witnesses creates the inference that their testimony would have been damaging to the State's case. Additionally, defendants Wormley and Murphy argue that the absence of proof on a number of points raises a reasonable doubt of their guilt.

■■ ■ A conviction for murder may be based solely on circumstantial evidence so long as the evidence eliminates every reasonable hypothesis of innocence. (*People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801; *People v. Hall* (1976), 40 Ill. App. 3d 56, 351 N.E.2d 639.) The circumstantial evidence "must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime." (*People v. Bernette* (1964), 30 Ill. 2d 359, 367, 197 N.E.2d 436, 441.) We believe that the evidence in this case produces a reasonable and moral certainty that all defendants committed the murder.

The conviction in this case was based largely upon the testimony of Patrice Freeman, a 13-year-old girl, who lived in a high-rise public housing project. Neither side disputes the rule of law that the testimony of one witness is sufficient to support a murder conviction provided the testimony is both positive and credible. (*People v. Garmon* (1974), 19 Ill. App. 3d 192, 311 N.E.2d 299; *People v. Stephenson* (1973), 12 Ill. App. 3d

201, 298 N.E.2d 218; *People v. Smith* (1970), 121 Ill. App. 2d 105, 257 N.E.2d 261.) Yet, they disagree over whether Freeman's testimony was positive and credible in light of certain pretrial statements which conflicted with her trial testimony. At trial, Freeman testified that when she arrived on the fifth floor after having walked down the staircase, she saw both defendant Wormley and defendant Hayes. She said that Wormley asked her to get a knife for him and that she did in fact get two knives for him. When she returned to the fifth floor with the knives, she saw all three defendants and noticed blood on their clothes. She also thought that she saw blood on Wormley's shoes. After she handed the knives to Wormley, he told her that *they* were "trying to kill a Stone." After he refused to return the knives to her, she looked into the laundry room and saw the body of the deceased. While she was looking at the body she said that all three defendants were six feet away from her. After seeing the body, she ran down to her apartment, but did not call the police. She said that she saw a boy, whom she refused to identify at trial, and told him that *they* were going to kill somebody. She said that her aunt was present while she was telling the boy about the killing. After a while, she went upstairs and heard the defendants on the sixth floor. She said that when she first saw them, one of them told her not to say anything about what had happened. Defendants Hayes and Wormley tried to return the bloody knives, but she refused to take them. Later, one of defendants whom she thought was Hayes, again told her not to say anything about what had happened. She said that she noticed that both Wormley and Hayes were wearing the same kind of gym shoes as they were wearing when she had first seen them on the fifth floor.

Freeman's testimony was corroborated in certain respects by Linda Burnett, Officer Thompson, and Doctor Claparols. Burnett testified that she had seen Wormley and Murphy on the fifth floor and that she had seen Freeman in the building on the night of May 16-May 17. Officer Thompson testified that the body of the deceased could be seen from the entranceway to the laundry room. He also stated that there were blood spatterings in the vicinity around the deceased and that he had photographed a shoe print which had been made in the blood. He described the shoe print as "gym-shoe type." Doctor Claparols testified that the deceased had suffered multiple injuries and wounds, specifically describing them as "stab-like" wounds. Additionally, the court admitted into evidence several photographs depicting the blood on and around the deceased's body.

After the incident, Freeman made several visits to the police station. At first, she continuously told the police that she did not know anything about the boy in the laundry room. On either her second or third visit she gave the police officers a written statement implicating Wormley and

Murphy. However, she made no mention of any involvement of Hayes or her visit to apartment 610 on the night of May 16-17. She also stated that she had taken only one knife out of Wardell Robinson's apartment. On her next visit, she told the police that Hayes was also involved in the killing. At some later date, she gave the police another written statement. In this statement, she referred to Hayes as "King" and said that he had sent her for the knife on May 16-17. She further stated that she gave the knife to Hayes and that he said that he was going to kill "this fellow." Later, before a grand jury, she also stated that she had given the knife to Hayes.

Linda Burnett's testimony partially corroborates Freeman's earlier statements. She testified that at no time did she tell the police that she had seen Hayes on May 16-17. Also, defendants Wormley and Murphy argue that their gym shoes were taken by the police on May 24, 1975, and tested for blood and that the negative results of the tests creates a reasonable doubt as to their guilt.

■■■ The contradictions between Freeman's trial statements and pretrial statements were properly matters of credibility for the trier of fact. (*People v. Ellis* (1976), 41 Ill. App. 3d 377, 354 N.E.2d 369.) Although Freeman admitted at trial that she had previously lied to the police officers about the events of May 16-17, we do not believe this destroyed the probative value of her testimony. (*People v. Hubbard* (1972), 4 Ill. App. 3d 729, 281 N.E.2d 767, *affirmed* (1973), 54 Ill. 2d 546, 301 N.E.2d 290, *cert. denied* (1974), 416 U.S. 958, 40 L. Ed. 2d 308, 94 S. Ct. 1973.) In fact, in light of the warnings which she received from some of the defendants and her expressed fear that she had to go back home after talking to the police and that she was afraid that she would be hurt by defendants' friends, we cannot say that her telling the police a different story than the story which she testified to at trial was unbelievable and contrary to human experience. (*People v. Stephens* (1973), 13 Ill. App. 3d 642, 301 N.E.2d 89.) Fear of harm oftentimes motivates an untruthful statement by an adult, let alone a 13-year-old. (*People v. Stringer* (1970), 129 Ill. App. 2d 251, 264 N.E.2d 31.) We believe that fear can explain Freeman's delay in telling the police the full story and her statements in the second written statement that Hayes sent her for the knife and told her that he was going to kill "this fellow." (See *People v. Stringer* (1970), 129 Ill. App. 2d 251, 264 N.E.2d 31.) In any event, the matter was a question of credibility for the jury and we cannot say that their resolution of the issue was so improbable, unreasonable, or unsatisfactory as to necessitate setting aside their finding.

Defendants also argue that the State's failure to call Investigators Kehoe and Kennedy creates the inference that their testimony would be damaging to the State's case. Their theory is that the police procedure used in this case to exact the statements from Freeman was vitally

important because it goes to the question of Freeman's credibility. They claim that Freeman's testimony and statements were not truthful because she had been threatened and influenced by the police officers into making the statements and giving the testimony.

■■ Although the police officers' testimony might have been important to the question of Freeman's credibility, we cannot say that the State's failure to call the officers gives rise to an inference that if called their testimony would have been damaging. Defendants were aware of the statements which Freeman had given to the police and they could have called the police officers to the witness stand. (*People v. Farnsley* (1973), 53 Ill. 2d 537, 293 N.E.2d 600.) Defendants have the right to summon all witnesses necessary for their defense. (*People v. Graham* (1977), 48 Ill. App. 3d 689, 363 N.E.2d 124; *People v. Johnson* (1977), 47 Ill. App. 3d 362, 362 N.E.2d 701.) If defendants cannot get the witnesses to appear, they may request that the court call them as court's witnesses. (*People v. Cokes* (1969), 106 Ill. App. 2d 139, 245 N.E.2d 507.) In any event, the State is not required to call all possible witnesses to prove a case beyond a reasonable doubt.

We disagree with defendant Hayes' contention that *People v. Smith* (1971), 3 Ill. App. 3d 64, 278 N.E.2d 551, mandates a different result in this case. In *Smith*, the facts were clearly distinguishable from those in the present case. There, the one witness was one of at least 19 occurrence witnesses to the offense. The witness also had consumed at least 10 drinks on the night of the offense. Here, the witnesses which the State failed to call were not occurrence witnesses and there was no testimony indicating that Freeman's ability to perceive the events of May 16-17 was in any way restricted. Therefore, we find the *Smith* case inapplicable to the present case.

■■ Finally, defendants Wormley and Murphy argue that the State's failure to prove how Stanley Beck got to 5201 South Federal and the existence of an outcry by Beck raises a reasonable doubt of their guilt. We disagree. In a case based on circumstantial evidence, the jury "need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt." (*People v. Williams* (1977), 66 Ill. 2d 478, 485, 363 N.E.2d 801, 804, quoting *People v. Bernette* (1964), 30 Ill. 2d 359, 367, 197 N.E.2d 436, 441.) We believe that the evidence in this case is sufficient to meet that standard. Freeman's testimony placed all of the defendants at or in the vicinity of the murder scene before and after she first saw the body. Her testimony described there being blood on the clothes of all defendants during this time. She stated that she handed the knives to Wormley and that he and Hayes attempted to return bloody knives to her.

She also stated that she was warned by one of them and by an individual who she thought was Hayes that she was not to say anything about what had happened. Her testimony was corroborated in a number of key respects by three witnesses. Simply because the State failed to sufficiently explain certain points does not give rise to a presumption of innocence. There was sufficient evidence in this record to convict all defendants beyond a reasonable doubt. *People v. Johnson* (1975), 32 Ill. App. 3d 36, 335 N.E.2d 144.

The next contention raised is whether the trial court committed reversible error by threatening Linda Burnett, and intimidating her while she testified. Burnett was called to testify as a witness for the State. While testifying about the first time that she had seen Wormley and Murphy on May 16-May 17, the following transpired:

"Mr. Burch [Assistant State's Attorney]: Q. When you saw them come to the sixth floor, Linda, did you see their clothes?

A. Yes, I seen their clothes.

Q. Did you notice anything about their clothes?

A. Not nothing special.

Q. Did you notice any spots or marks on their clothes at all?

Mr. Lott [attorney for defendant Murphy]: Object.

The Court: Sustained.

Mr. Burch: Did you see anything at all on their clothes, Miss Burnett?

Mr. Howse [attorney for defendant Wormley]: Object, your Honor.

The Court: Overruled.

A. That is the question?

Mr. Burch: Q. Yes.

A. Anything special like what? You have to tell me what, you know, what you want me to say.

Mr. Lott: I'll object—no, I will not object. Object.

The Court: Objection overruled.

Mr. Burch: I want you to tell me if you saw anything on their clothes?

A. Like what? I mean—

Q. Marks or spots, any marks of any kind on their clothes.

A. It might have been you have to be specific, I don't know the word, you got to tell me what kind of marks you mean.

The Court: Take the jury out, please."

(The following proceedings were had outside the presence and hearing of the jury):

"The Court: Miss Burnett, you will make it much easier for yourself if you answer the questions as they are put to you. I do not

believe that you do not understand the questions, so I would suggest to you————————

A. Well—

The Court: No, you listen to me now, you are not out on the street, you are in my courtroom, and if I come down on you, you are going to feel it.

Now you listen to what I'm saying, and look at me when I talk to you.

I would suggest that you listen to the questions, no one is asking you to tell anything other than what you saw or heard, that is all, no more, but you are not going to tell any less.

Do you understand me?

A. Yes.

The Court: All right. Bring the jury back."

Counsel for each of the defendants objected to the trial court's treatment of the witness. Nevertheless, only defendants Wormley and Murphy raise the issue in their brief in which they contended that the court was threatening the witness and in doing so it revealed "a lack of impartiality and prejudice toward the defense's case, and a hostile attitude." At the oral arguments before this court, counsel for Wormley and Murphy expressed the fear that the court's "street language" had frightened Burnett into not telling the truth at trial.

■ Questions of credibility are for the trier of fact and, in a jury trial, the trial court should not make any comments which could lead the jury to believe that the court favors or believes one side over the other. (*People v. Tyner* (1964), 30 Ill. 2d 101, 195 N.E.2d 675; *People v. Godbout* (1976), 42 Ill. App. 3d 1001, 356 N.E.2d 865.) Nevertheless, that restriction is only meaningful in situations in which the jury is either present at the time of the comments or has heard of the trial judge's comments during the course of the trial. Where, as in the present case, the trial judge has dismissed the jury and there is no charge made and substantiated that the jury heard of the trial court's comments, there is no danger that the comments might influence the jury in its determination of credibility.

■■ Additionally, we cannot agree with the defense contention that the court's "street language" intimidated Burnett into making untruthful assertions. Such language might be improper if spoken in the presence of a jury (*People v. Bucciferro* (1976), 37 Ill. App. 3d 211, 345 N.E.2d 738); however, given the circumstances of this case, we do not think that it was improper here. Also, we do not believe that it was intimidation. Linda Burnett was a streetwise individual and the court's choice of language was obviously geared to communicating to her the importance of testifying truthfully. Furthermore, once Burnett resumed her testimony, she did not

say anything which would indicate that the court's street language affected her testimony. She continued to be evasive on the question of what she had seen on the clothes of Wormley and Murphy. Her testimony after the admonition by the trial court was:

"Mr. Burch: Right. The question is: Did you see any spots or marks of any kind on any part of their clothing?

A. Well, I could have seen dirt spots, I could see dirt spots, I don't know what kind of spots you want for me to say.

Mr. Burch: Q. What portion of their clothes did you see the spots on?

A. Well, I wasn't really looking at their clothes."

Also, Burnett continued to deny having seen defendant Hayes at any time during the events of May 16-17. As a result, we cannot say that the trial court committed any error, let alone reversible error, in this instance.

Defendants Wormley and Murphy contend that the trial court erred when it admitted into evidence photographs of the murder scene. The photographs depicted the entranceway to the laundry room, the laundry room with the deceased's body present, a close-up of the deceased's body in the laundry room, a shoe print made in blood in the laundry room, and three morgue photographs of the victim. The court admitted into evidence all of the photographs, but refused to allow the close-up photograph of the deceased's body in the laundry room and the three morgue photographs to be displayed to the jury. Defendants argue that the morgue photographs were gruesome and that the photograph of the deceased's body in the laundry room, which was allowed to be seen by the jury, was highly prejudicial. Defendants do not specifically argue why they feel the admission of the other photographs was error.

Photographs of the scene of a murder may be admitted into evidence if they have probative value. (*People v. Johnson* (1975), 28 Ill. App. 3d 139, 327 N.E.2d 535; *People v. Smith* (1972), 5 Ill. App. 3d 648, 283 N.E.2d 727.) Photographs of the body of the deceased, even gruesome ones, are also admissible if they have some probative value. (*People v. Owens* (1976), 65 Ill. 2d 83, 357 N.E.2d 465; *People v. Lett* (1978), 61 Ill. App. 3d 467, 378 N.E.2d 208.) The decision to admit photographs into evidence lies within the sound discretion of the trial court and will not be reversed unless the court has abused its discretion. *People v. Radford* (1978), 65 Ill. App. 3d 107, 382 N.E.2d 486; *People v. Jones* (1978), 62 Ill. App. 3d 443, 379 N.E.2d 301.

■■ In the instant case, all of the photographs admitted into evidence had some probative value. The photograph of the laundry room was relevant because it aided the jury in its understanding of Officer Thompson's testimony. The photograph of the body of the deceased in the laundry room was relevant in that it aided the jury in determining whether

Freeman could actually see the body when she looked into the laundry room. It also aided the jury in that it depicted blood spatterings around the victim's body; thus, it was probative on the question of whether the victim had died before appearing in the laundry room. The photograph of the shoe print made in blood was relevant because there was testimony that the print was a "gym-shoe type" print and that at least two of defendants were wearing gym shoes on the night of the occurrence. The close-up photograph of the deceased and the morgue photographs were relevant because they demonstrated the extent of the injuries and wounds suffered by the victim, and also, they showed considerable bleeding by the deceased, thus supporting the contention that the deceased had died in the laundry room. As a result, we find that the trial court did not err in admitting any of these photographs into evidence.

Defendants further argue that the prejudicial effect of the photograph depicting the deceased's body outweighed its probative value and thus should not have been displayed to the jury. This same argument was made in *People v. Owens* (1976), 65 Ill. 2d 83, 357 N.E.2d 465. In *Owens*, defendant argued that since both a "life and death" witness and a pathologist had testified, there was no probative value to the photographs depicting the deceased's wounds and the photographs could only arouse the emotions of the jury. The court ruled that the photographs were relevant to prove facts in issue. Likewise in this case, we believe the photograph to be relevant. Furthermore, we note that this photograph of the deceased was taken from a distance, unlike the other photographs which the trial court properly refused to allow the jury to take into the jury room. In light of its relevance independent of the extent of the injuries which it showed, we cannot say that the trial court ruled incorrectly in permitting this photograph to be displayed to the jury.

Defendant Hayes contends that he was denied a fair trial where members of the jury saw the photographs which the trial court ruled the jury was not to see. As part of his motion for a new trial, defendant provided the court with three affidavits which indicated that at least two jurors had seen these photographs of the deceased during the course of the trial. In one of the affidavits, a juror, who was sitting in the back row of the jury box, indicated that he had seen the photographs while the assistant State's Attorney was examining a witness/policeman. He stated that the assistant State's Attorney held the pictures behind his back while standing by the side of the jury box within arms reach of the witness. He said that he could see the victim lying on his back and generally the "physical condition of the body proper." The other affiants were the assistant public defender who represented Hayes at trial, Robert W. Queeny, and an individual who overheard a telephonic conversation which Queeny had with a juror. In his affidavit, Queeny indicated that he

had spoken to two jurors who told him that, prior to signing a verdict, members of the jury either said that they had seen the gruesome photographs or discussed the photographs among themselves. The trial court denied defendant's motion without inquiry into the substance of the affidavits; the court ruled that defendant was attempting to impeach the jury's verdict. Defendant argues that this was reversible error and requests this court to either reverse and remand for a new trial or, alternatively, to reverse and remand for a limited inquiry into the substance of the affidavit.

Defendant relies upon the supreme court's decision in *People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656. However, our reading of *Holmes* leads us to a result contrary to that requested by defendant. *Holmes* states that when extraneous or unauthorized information reaches the jury, a reversal is required only when defendant is prejudiced. (69 Ill. 2d 507, 519, 372 N.E.2d 656, 661-62; *People v. Coe* (1978), 67 Ill. App. 3d 552, 384 N.E.2d 987.) In *Holmes*, the court found prejudice in that the extraneous information in that case "was in the nature of evidence crucial to the question of defendant's identification with which he had neither been confronted at trial nor had the opportunity to refute." (69 Ill. 2d 507, 519, 372 N.E.2d 656, 662.) In the instant case, the extraneous information was neither crucial nor explicit enough for us to make a determination that defendant was prejudiced.

The affidavits indicated that at least two jurors had seen pictures of the body and its general physical condition. The pictures were characterized as "gruesome." At trial, three witnesses testified to the general physical condition of the body of the deceased. Freeman testified that she saw the victim lying on the floor and said that he was bloody. Officer Thompson, the mobile lab technician, testified that he saw the victim's partially naked body and said that it was in a state of decomposition. He also said that the victim was lying face forward in some garbage and burned debris, that there was some burned garbage on top of the body, and that there were blood spatterings on the floor and wall around the body. Dr. Claparols, a pathologist, testified extensively on the internal and external wounds and injuries to the victim's body. He stated that the victim had suffered burns, lacerations, and abrasions to many areas of the body. He also stated that the victim sustained rib fractures. Since the photographs in issue here merely depicted that which had already been testified to at trial, we cannot conclude that these photographs provided the jury with any crucial information with which defendant neither had been confronted at trial nor had the opportunity to rebut.

■■■■ Furthermore, we do not believe that the affidavits in this case are as explicit as need be in order to require the trial court to look into

the allegations made therein. The juror-affiant, who had been sitting in the back row of the jury box, merely stated that he could see the victim lying on his back and that he could see generally the physical condition of the body proper. The other affiants merely stated that some jurors had heard other jurors discuss the gruesome nature of the photographs. We cannot say that a court is required to conduct a hearing based on these generalized statements. (*People v. Lambert* (1978), 60 Ill. App. 3d 280, 376 N.E.2d 790.) Therefore, we hold that defendant Hayes was not denied a fair trial in this instance.

The next contention is whether any of the defendants were denied a fair trial by the assistant State's Attorney's assumption of facts in his rebuttal argument. The facts allegedly assumed included: (1) a reference to a statement made by the late Congressman Ralph Metcalf that the Robert Taylor Homes (where Freeman lived) were breeding grounds for murder, rape and robbery; (2) a statement that Freeman lived in an atmosphere of terror and fear; (3) a statement that Freeman lived in a building which police protection could not cope with; (4) a statement that Freeman lived in a building under the influence of defendants; and (5) a statement that Freeman was afraid when she was in the police station because she had to go home to 5201 Federal, back to defendants and their friends. Defendant Hayes contends that considering the nature and weight of the case against him, these statements constituted reversible error. Defendants Wormley and Murphy also argue that these statements amounted to reversible error. However, they add that the assistant State's Attorney's response to defendant Murphy's counsel's accusation that "[t]hey tried to frame my client" was a distortion of what was said. Also, they contend that the trial court's words of admonition to the defense attorneys who objected to all of the above remarks compounded their prejudicial effect. We will first consider defendants' contention concerning the last four allegedly assumed facts.

As a general rule, assumed facts not based on any evidence in the case may not be argued to the jury (*People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280; *People v. Kilzer* (1978), 59 Ill. App. 3d 669, 375 N.E.2d 1011; *People v. Hill* (1977), 45 Ill. App. 3d 14, 358 N.E.2d 1350.) Only facts which are found in the evidence or which may be legitimately inferred from the evidence may be argued to the jury. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840; *People v. McTush* (1978), 61 Ill. App. 3d 214, 377 N.E.2d 1148.) The last four allegedly assumed facts either have some basis in the evidence or their impact on the trial was not such that defendants were prejudiced. Freeman's fear of defendants and their friends was mentioned time and time again to explain her failure to inform the police sooner and to tell them the truth and the complete story when she finally did talk to them. We believe that it is proper to infer from

this testimony that Freeman lived in an atmosphere of fear and terror and that she lived in a building influenced by defendants. Also, although there was no evidence at trial that defendants lived in the building, there was testimony that they knew the building and, in fact, committed the murder in the building. We believe that it was proper to infer from that testimony that Freeman believed that when she returned home she would be returning to defendants and their friends. Finally, although it was perhaps improper for the prosecutor to state that Freeman lived in a building which police protection could not cope with, we do not believe that this comment merits reversal in this case.

■■ The prosecution argues that the reference to Congressman Metcalf's statement was not improper because it "was made within a framework of permissible inferences from the record that Patrice [Freeman] lived in an atmosphere of fear." We cannot agree. Use of the authority or popularity of a public official to persuade the jury that what is being said is authentic is improper. (*People v. Valdery* (1978), 65 Ill. App. 3d 375, 381 N.E.2d 1217; *People v. Forgie* (1978), 61 Ill. App. 3d 206, 377 N.E.2d 1320.) However, considering the evidence in this case, we do not believe that this comment either alone or in conjunction with the assumed fact that Freeman lived in a building which could not be protected by the police is sufficient to merit reversal.

■■ In response to defendants Wormley and Murphy's accusation that the prosecutor's response to the charge of being framed was a distortion, we merely indicate that the record shows nothing of the sort. In his closing argument, counsel for defendant Murphy argued:

> "When a thug in the street does it, it is a crime. Whey they do it in a courtroom, they call it justice. Don't be caught up on that.
>
> They tried to frame my client. They got no evidence of him being in that laundry room, none whatsoever. What they have got, what they have got is some little items of evidence that they have been able to prove and they are trying to parlay those bits and pieces into what you have heard about since you first came into the courtroom."

The assistant State's Attorney's response was:

> "Mr. Lott pointed his finger at us and told you we were framing him. It is not true."

We believe that the response of the prosecution was "invited comment" and as such was proper in this instance. *People v. White* (1977), 52 Ill. App. 3d 517, 367 N.E.2d 727; *People v. Carbona* (1975), 27 Ill. App. 3d 988, 327 N.E.2d 546.

■■ We see no merit to the final argument of defendants Murphy and Wormley that the trial court's admonitions to defense counsels compounded the prejudicial effect of the prosecutor's comments during

rebuttal. The court warned counsel for Hayes that if he made one more remark, appropriate action would be taken. Following this admonition, when counsel for Wormley attempted to say something to the court, the court suggested that he not say anything either. Prior to these admonitions, counsels for the defense continuously repeated objections to the prosecutor's rebuttal argument. Most of these objections were overruled. In other instances, after the trial court had sustained an objection, counsel for the defense would continue talking. Also, prior to these admonitions, the trial court had warned counsel for the defense not to raise his voice. We believe that considering the prior actions of counsels for the defense, admonitions were appropriate here. We cannot say that the court's admonitions manifested any hostility prejudicing defendants in the eyes of the jury. (*People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468; *People v. Rosenborgh* (1974), 21 Ill. App. 3d 676, 315 N.E.2d 545.) Therefore, after considering all the arguments on this issue, we conclude that defendants were not denied a fair trial on the basis of what transpired during rebuttal argument.

The last contention raised is whether defendant Hayes' sentence of 75 to 100 years was excessive. Defendant contends that the sentence completely ignores his rehabilitative potential. He asks this court to reduce his minimum sentence.

Section 11 of article I of the Illinois Constitution (Ill. Const. 1970, art. I, §11) provides:

> "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."

We think that it is clear from this language that a court is required to consider the rehabilitative potential of defendant in setting sentence. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Kane* (1975), 31 Ill. App. 3d 500, 333 N.E.2d 247.) However, in considering the rehabilitative potential of defendant in setting sentence, the trial court is not required to give greater weight to that consideration than it is to give to the seriousness of the offense. (*People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552, 301 N.E.2d 300; *People v. Luckey* (1975), 35 Ill. App. 3d 179, 341 N.E.2d 112.) In responding to defendant's request that we exercise our power to reduce sentence (Ill. Rev. Stat. 1977, ch. 110A, par. 615(b)(4)), we must bear in mind that the trial court has wide discretion in setting sentence (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882) and a sentence should not be altered unless it is apparent that the trial court has abused its discretion. (*People v. Givens* (1977), 46 Ill. App. 3d 1035, 361 N.E.2d 671.) An abuse of discretion will be found "if the sentence imposed is greatly at variance with the purpose and spirit of the law, or greatly disproportionate to the nature of the crime." *People v. Willett* (1976), 44 Ill. App. 3d 545, 551, 358 N.E.2d 657, 663.

■■ We believe that the trial court's sentence in this instance was not "greatly at variance with the purpose and spirit of the law, or greatly disproportionate to the nature of the crime." The crime of murder is punishable by death or imprisonment for any indeterminate term, with a minimum term of fourteen years. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b).) The punishment is severe because the offense is so inimical to the laws of a civilized society. In the instant case, the murder which was committed was of a particularly heinous nature. The victim, a 14-year-old boy, suffered numerous vicious wounds to many areas of the body. The jury's verdict in this case indicates that the crime was committed by three young men, one of whom was defendant Hayes. Although we are not unmindful of the fact that Hayes is 20 years old and that the minimum sentence of 75 years might "crush whatever incentive defendant has to improve himself while in prison," we also are not unmindful of the severity of the crime committed here and the absence of reasons to expect defendant to become rehabilitated. Counsel for Hayes has provided us with very little of his background which might indicate that he has strong rehabilitative potential. He did not take the witness stand and we are told only that he has had one prior conviction which was for criminal damage to property. However, nothing else is offered other than the possibility that this 20-year-old in the years ahead will become rehabilitated. We do not believe that this is enough for us to say that the trial court has abused its discretion. Therefore, we will not reduce the trial court's sentence of 75 to 100 years.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.