THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DOUGLAS L. STEPHENS *et al.*, Defendants-Appellants.

(No. 56756; ▮▮▮▮▮▮▮▮▮▮▮

First District (4th Division)—July 25, 1973.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Kenneth L. Gillis and Jack P. Rimland, both of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago, (Elmer C. Kissane, Robin K. Auld, and Robert Beranek, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

The three defendants, Herbert Stephens, Douglas Stephens, and Namor Smith, Jr., were convicted of murder by a jury in the Circuit Court of Cook County. Herbert Stephens was sentenced to a term of 100 to 200 years; Namor Smith was sentenced to a term of 50 to 100 years; and Douglas Stephens was sentenced to a term of 20 to 30 years. All defendants appeal.

The issues presented for review are (1) whether the court erred in making Elaine Goins a court's witness; (2) whether the State proved the defendants guilty beyond a reasonable doubt; (3) whether the State proved the legal accountability of Douglas Stephens and Namor Smith for the murder; (4) whether a police statement was properly allowed to impeach the credibility of a court's witness; (5) whether failing to notify the defendants before closing arguments that the State would seek the death penalty denied them a fair trial; (6) whether the prosecutor's closing remarks to the jury were prejudicially improper; and (7) whether the court erred in granting a discretionary extension of the Fourth Term.

In the early morning hours of September 13, 1969, Sterling Burnett, also known as "Little Man," was found shot to death in the alley behind 4617 South Langley Avenue in Chicago. One of the principal witnesses, Elaine Goins, testified on direct examination she saw Douglas Stephens, Namor Smith and several others carry Sterling Burnett through her house at 4611 South Langley in the City of Chicago in response to an order by Herbert Stephens, who followed a few feet behind. She heard Burnett say, "My mouth is bleeding, my mouth is kicked, my mouth is bleeding." After they carried him through the house she heard four shots. Herbert and Douglas Stephens and Namor Smith returned to the porch without Burnett, and Herbert, who had a gun in his hand, told her, "I don't want to hear no more about this." The three then ran off the porch toward 46th Street.

At approximately midnight, Elaine Goins went to 47th Street, where she saw Trammell Hunter, talked to him for five or ten minutes, and then returned to her house. At approximately 1:00 A.M., Trammell Hunter came back to the house with the police, and upon going back in the alley she observed Sterling Burnett lying on his back, dead.

On cross-examination she repudiated her testimony on direct and

stated that on the night of September 12, 1968, she had sniffed cocaine and drunk alcohol. She stated she was drowsy and dizzy and testified to things someone had told her rather than what she had seen. Following completion of cross-examination, the State moved that the witness be declared hostile under Illinois Supreme Court Rule 238. The court denied the motion but stated it would allow the prosecutor some leeway on redirect. On redirect she eventually declared the facts she testified to on cross-examination were not true. She said she was afraid if she told a story different from that given to the grand jury she would be charged with perjury. The court granted her immunity for any past perjury, and declared her a court's witness. She then denied any knowledge of the statement she made to the police on the night of the murder, asserted she was high on drugs both on the night of the murder and when she went before the grand jury and denied seeing the deceased between 9:00 P.M. and midnight on the day in question.

She said the police put words in her mouth and threatened to take her three children away if she did not sign the statement. Miss Goins was the mother of three illegitimate children at the time of the murder and gave birth to a fourth child the following June, fathered by Herbert Stephens.

The second principal witness, Calvin White, testified that on the night in question he was at 4611 Langley with his cousin, Greg Armstrong. He stated he heard a conversation between Burnett and the defendants. Herbert Stephens asked him if he were a "Stone" (Blackstone Ranger gang member), and Burnett replied he was not. White then saw Herbert hit him and heard Herbert tell Greg Armstrong, Douglas Stephens, Namor Smith and another to pick him up and carry him out back. As they were going through the house, he saw someone hand Herbert Stephens a weapon. After they placed Burnett on the ground they told Calvin White to go home. He went back into the house and heard four shots. He ran to the fence between 4611 and 4613 Langley and heard another volley of shots, after which he walked to Greg Armstrong's house.

White said he made a statement to the police and testified before the grand jury to these same facts, but gave a contradictory version to defense counsel sometime in 1969, when he was picked up by some boys, taken downtown at gunpoint, and told to deny seeing Herbert Stephens and Namor Smith on the night of the murder, or he would be killed.

Mrs. Mary Armstrong, Calvin White's aunt, testified that Calvin and her son, Gregory Armstrong, were sleeping inside her house when she heard the shots. She stated the boys came into the house at 9:00 P.M. and went to bed at 10 o'clock.

Trammell Hunter testified he left work at midnight and arrived at 47th Street at 12:30 or 12:45. He saw Elaine Goins, "who seemed disturbed." After talking to her he went to get a couple of friends and then went to the alley where he found the body of Sterling Burnett.

At the close of all the evidence, the prosecution tendered an instruction to the judge allowing the jury to return a death verdict. The instruction was tendered to the jury, and a verdict of guilty with the recommendation of death was returned as to Herbert Stephens. The judge disregarded the recommendation and sentenced all three to the penitentiary.

■■ The defendants first contend the court erred when it made Elaine Goins a court's witness because she was not an eyewitness to any criminal act, citing the cases of *People v. Hundley* (1954), 4 Ill.2d 244; *People v. Banks* (1955), 7 Ill.2d 119; *People v. Boulahanis* (1946), 394 Ill. 255; and *People v. McKee* (1968), 39 Ill.2d 265. This argument necessitates a narrow construction of the term "eyewitness." Miss Goins saw Sterling Burnett being carried through her house by two of the defendants shortly before she heard shots ring out, after which the three defendants emerged from the house with a weapon and ran off. In the words of the trial court, she was "an obvious eyewitness, certainly to very material facts" with regard to the murder. We think the calling of a court's witness is not to be so strictly limited where there might otherwise be a miscarriage of justice.

Second, the defendants argue they were not proved guilty beyond a reasonable doubt because the evidence against them was improbable and unsatisfactory, and they cite the case of *People v. Coulson* (1958), 13 Ill.2d 290, in support of their claim. In that case the court reversed an armed robbery conviction where the victim, who was the only witness to the alleged robbery, testified that five men took his wallet at gunpoint, accompanied him to his home on the promise of more money, and permitted him to go inside alone while they waited outside, trusting that he would not call the police. The court found this story to be unworthy of belief.

In the instant case the two principal witnesses gave contradictory accounts of the facts at different times rather than giving facts which were unbelievable. It then became the province of the jury to determine which accounts were true, and this court will not disturb their determination unless there was no rational basis for it. *People v. Stewart* (1970), 46 Ill.2d 125.

The record shows Elaine Goins was questioned for the first time a few hours after the murder of Sterling Burnett and gave a statement

similar to that which she gave on direct examination. Ten days later she testified before the grand jury and apparently told the same story. On April 29, 1969, seven months later, she gave an account to a defense attorney that contradicted her earlier statements, alleging the police had threatened her and put words in her mouth.

The jury was, nevertheless, given ample evidence to cause them to believe her initial testimony. Detective Hogan, a man who was well acquainted with people under the influence of drugs, testified that in his opinion Elaine Goins was not under the influence of narcotics, either on the night of the murder or during her grand jury appearance.

Trammell Hunter testified he discovered the body of the deceased only after talking with Elaine Goins sometime after midnight on the night of the murder. The jury could infer she told him the same things she related on direct examination. Finally, she testified her fourth illegitimate child was born in June of 1969, approximately nine months after the murder, and the father is Herbert Stephens. It is unlikely she knew of her pregnancy, either on the night of the murder or at the time of her grand jury appearance. The jury could also have found it was unlikely she wanted to put the father of her child in jail and changed her testimony to protect him.

Calvin White gave testimony which substantially corroborated the story Elaine Goins told on direct examination. The defendants suggest this testimony is not to be believed because his aunt, Mrs. Armstrong, testified both Calvin and her son, Greg Armstrong, were sleeping at the time the shots were fired. Defendants also suggest the State could not have believed Calvin White because they failed to indict Greg Armstrong, who White described as one who carried Sterling Burnett through the house; he was impeached by his testimony to the grand jury; and he told an unbelievable tale of being taken downtown at gunpoint and told to disavow knowledge of the murder or be killed.

In Mrs. Armstrong the jury was again presented with the testimony of one who had a strong motive not to tell the truth. Her son had not been indicted, and she could have been trying to insure that he would not be, by stating both he and Calvin White were in bed rather than at the scene of the crime.

Why the State did not indict Greg Armstrong is completely a matter of speculation and does not bear upon Calvin White's credibility. Neither is the alleged impeachment significant. He said at trial he did relate to the grand jury the conversation between the deceased and the defendants in which the deceased stated he was not a "Stone." Defense counsel pointed out he had not included this reference in his grand jury

testimony. That difference in testimony does not appear significant and does not make his story inherently unbelievable. The defendants also suggest White's testimony about being taken downtown at gunpoint is unbelievable and contrary to human experience. The fact that intimidation of witnesses sometimes exists is not contrary to human experience, and in this case the witness was flown in from the South, where he now lives, by two officers. He stayed at the Audy home at night and was promised he would be sent back after the trial. There is also testimony in the record that Elaine Goins asked for and received protective custody prior to trial, although she denied asking for it.

■■ Third, the defendants suggest Douglas Stephens and Namor Smith were not legally accountable for the murder of Sterling Burnett because the State failed to prove beyond a reasonable doubt they possessed the specific intent to promote or facilitate the murder of Sterling Burnett. Section 5—2(c) of the Illinois Criminal Code (Ill. Rev. Stat., ch. 38, § 5—2(c)) provides in part:

"A person is legally accountable for the conduct of another when:
(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

It is argued the mere presence of Douglas Stephens and Namor Smith at the scene of the crime is not sufficient to prove they knew a crime was about to be committed. However, their concert of action indicates a common purpose which made them responsible for whatever crime was committed under the statute. (*People v. Armstrong* (1968), 41 Ill.2d 390.) After the victim had been hit by Herbert Stephens they responded to an order to take him to the back. They did so even though they knew Herbert Stephens had a gun. After the shots were fired, they waited for Herbert Stephens to rejoin them and stood by while he told Elaine Goins that "he didn't want to hear no more about it," and then ran off with him.

■■ Fourth, the defendants contend the court erred in permitting the State to impeach the court's witness, Elaine Goins, by reading to the jury an unsworn statement she made to the police on the night of the murder. They cite the cases *People v. McKee* (1968), 39 Ill.2d 265, and *People v. Dandridge* (1970), 120 Ill.App.2d 209, in support of the proposition. However, in the instant case the facts contained in the unsworn statement were the same as those testified to on direct examination and did not come before the jury for the first time. In addition, the court gave an instruction that the jury should consider the statement for impeachment purposes only. Where matters contained in a statement

have already been established by competent evidence, the hearsay statement is merely cumulative and, therefore, harmless. (*People v. DeBerry* (1965), 62 Ill.App.2d 323; *People v. Smith* (1969), 105 Ill.App.2d 8.) The statement was not used to prove the truth of the matter asserted, or to get such matters in evidence, as proscribed by *McKee*, but rather to impeach the credibility of a reticent court's witness.

■■ Fifth, the defendants complain they were denied a fair trial because the State failed to notify them it would seek the death penalty prior to closing argument. They argue that when the issue of the death penalty is raised on *voir dire*, the jurors have time to consider it throughout the entire trial, and to postpone it until closing arguments is prejudicial because it has a coercive effect on the jury and affects defense counsel's selection of a jury. In this case we find no prejudice inasmuch as defense counsel in his closing argument invited the jury to "give them their liberty or sign the death verdict," and the court rejected the jury's recommendation of the death penalty.

■■ Sixth, the defendants urge they were prejudiced by several statements contained in the prosecutor's closing argument. The first one complained of occurred when the prosecutor stated the attorney for Namor Smith had "sold [Herbert Stephens] down the river" when he argued in behalf of his client, and inferred that only Herbert Stephens was responsible for the murder. The defendants now contend it was proper for an attorney to represent only his client in a multi-defendant trial and the effect of the prosecutor's statement was to arouse the antagonism of the jury against all the defendants and their attorneys. They cite cases to support their claim of prejudice, but those cases all involve allegations by the prosecutor that defense counsel was trying to trick and confuse the jury. Here, the prosecutor inferred that defense counsel made attempts to exculpate two of the defendants while omitting any reference to Herbert Stephens. The reference was objected to and sustained, and there is no reason to believe the jury was unduly prejudiced by it.

■■ The defendants allege it was prejudicial error for the prosecutor to state that Calvin White was in physical danger for having testified against the defendants. They argue the inference has no basis in the evidence and constitutes reversible error, citing *People v. Glickman* (1960), 27 Ill.App.2d 379. However, that case states such remarks are prejudicial if they are without foundation. In this case there is testimony in the record that Calvin White was in protective custody during his stay in Chicago at the time of the trial. The fact that Calvin White feared for his safety bears favorably on his credibility as a witness, and it was not improper to comment on such evidence in closing argument.

The defendants suggest it was error for the prosecutor to comment on

the fact that Trammell Hunter found the body of Sterling Burnett after having talked to Elaine Goins. They argue that because any conversation between Miss Goins and Hunter is hearsay, it is also inappropriate for the State to draw an inference as to what the conversation was about from Trammell Hunter's conduct.

It is well settled that a prosecutor may make reasonable inferences predicated on the evidence. (*People v. Fort* (1970), 119 Ill.App.2d 350.) We believe the prosecutor did not exceed the bounds of legitimate argument when he suggested to the jury what they may infer from the meeting of Miss Goins and Trammell Hunter and his subsequent discovery of the body. It is also significant to note no objection to the comment was made at trial, and it is the law that a party not argue a point for the first time on appeal. *People v. Long* (1968), 39 Ill.2d 40.

■■ The last comment of the prosecutor on closing argument objected to by the defendants is his reference to the similarity between the murder of the deceased and the revelations of th Nuremburg trials. That was not a reference to the "ghastly horrors of World War II Nazi Germany," as the defendants contend, but merely a comparison to the summary nature of the execution of people having the wrong status. In this instance, Sterling Burnett was apparently murdered because he was not a member of the Blackstone Ranger street gang.

Finally, the defendants complain it was error for the court to grant the State a 60-day extension of the Fourth Term because it failed to demonstrate due diligence required by statute to obtain the material witnesses. Section 103—5(c) of the Illinois Criminal Code (Ill. Rev. Stat., ch. 38, § 103—5) provides:

> "(c) If the court determines that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day the court may continue the cause of application of the State for not more than an additional 60 days."

The power to grant such an extension is discretionary and the judgment of the court will not be disturbed unless there has been a clear abuse of discretion. *People v. Poland* (1961), 22 Ill.2d 175; *People v. Irish* (1966), 77 Ill.App.2d 67.

■■ It appears in the instant case there was no abuse of discretion because the motion was granted based on a petition and hearing, in which it was determined two police officers made repeated efforts to locate the two principal witnesses without success, but there was a reasonable ground to believe they could be found at a later date. Under the cir-

cumstances, we believe granting an extension of the Fourth Term was proper.

For these reasons, the judgments of the Circuit Court of Cook County are affirmed.

Affirmed.

BURMAN, P. J., and JOHNSON, J., concur.