THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EUGENE PRICE, Defendant-Appellant.

First District (2nd Division)   No. 78-610

Opinion filed September 4, 1979.—Rehearing denied October 5, 1979.

616

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Rimas F. Cernius, and James M. Thunder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant was arrested on July 8, 1974, and charged with two counts of armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 18—2) which arose out of an incident occurring on April 24, 1974. One week earlier, on July 1, 1974, defendant had been arrested for disorderly conduct in an unrelated incident. Upon motion in the July 1, 1974, case, the trial court suppressed evidence relating to charges against defendant arising out of that arrest.[1]

In the case at bar, defendant moved to suppress all evidence of in-court and out-of-court identifications on the ground that those identifications were the "fruit of the prior illegal arrest" for disorderly conduct on July 1, 1974. After a hearing on the motion, the trial court found that the photograph of defendant, taken following his arrest on July 1, 1974, was taken in accordance with "general bookkeeping procedures of the Chicago Police Department."[2] The trial court also found that defendant's arrest on July 1, 1974, was not a "subterfuge" to

---

[1] The record fails to indicate whether defendant's arrest of July 1, 1974, was quashed, but it appears that no further proceedings ensued against defendant on the charges arising out of that arrest.

[2] We believe the reference to "general bookkeeping procedures" was in error and was intended to read general booking procedures.

obtain his photograph. Thus, the court denied the motion to suppress. After a jury trial, defendant was found guilty of both counts of armed robbery, and the court sentenced defendant to a term of five to eight years.

Defendant appeals presenting the following issues for review: (1) whether the trial court erred in admitting into evidence identification testimony obtained as a result of a prior illegal arrest; (2) whether defendant was deprived of his right to have the jury evaluate the identification evidence; (3) whether defendant was denied his right to a fair trial because the jury may have inferred from testimony that defendant had committed offenses unrelated to those with which he was charged in the instant case; (4) whether the prosecution during both cross-examination and closing argument improperly discredited the testimony of the defense witness by misrepresenting to the jury that the witness was immune from prosecution for perjury; (5) whether the prosecution's closing argument improperly referred to defendant's failure to testify.

For the reasons hereinafter set forth, we affirm.

On April 24, 1974, at approximately 10 p.m., Willie Hughes and Rosetta Showers Hughes[3] (hereinafter referred to as Showers) were robbed at gunpoint in Jo Jo's Lounge at 6631 South Ashland in Chicago, Illinois. On July 8, 1974, defendant, Eugene Price, was arrested and charged with two counts of armed robbery.

Prior to trial, defendant filed motions to suppress all testimony of in-court and out-of-court identifications made of him. He alleged that he had been illegally arrested on July 1, 1974, taken to the police station, photographed, fingerprinted, searched, questioned, charged and then released. He further alleged that the photograph taken following his arrest on July 1, 1974, was used to effectuate his arrest upon the instant charges on July 8, 1974.

At the preliminary hearing on the motions defendant moved to admit a report of proceedings on the motion to quash his arrest of July 1, 1974, and to suppress the evidence arising therefrom. The report of proceedings was admitted and revealed that defendant's motion to suppress had in fact been sustained.

The following testimony was adduced at the preliminary hearing on the motions. Officers Steen, Dorn and Alesi testified that defendant had been photographed following his arrest on July 1, 1974. The officers displayed this photograph of defendant, together with photographs of nine other people also arrested on July 1, 1974, to one Louis Watkins.

[3] At the time of the crime Hughes and Showers were engaged to be married. They married prior to the time of trial.

Watkins also had been robbed on April 24, 1974, at his tavern at 7352 South Ashland, Chicago, Illinois.[4] From these photographs Watkins identified defendant and two other persons as the ones who had robbed him.

As a result of the photographic identification by Watkins, defendant was arrested on July 8, 1974. The police then photographed him again. The latter photograph was shown to Hughes and Showers on July 8, 1974, and they made positive identifications of defendant as one of the men who had robbed him. Also on July 8, 1974, Watkins, Showers and Hughes individually viewed a lineup which included defendant and Willie Howell, an alleged co-offender. Watkins, Showers and Hughes again made positive identifications of defendant.[5]

The trial court denied the State's proffer of evidence allegedly showing an independent basis for the identification. The court found that defendant's photograph taken on July 1, 1974, had been taken in accordance with general booking procedures of the police department. The court further found that defendant had not been arrested on July 1, 1974, solely as a subterfuge for the purpose of obtaining his photograph or fingerprints. On that basis defendant's motions to suppress all testimony of in-court and out-of-court identifications were denied.

Willie Hughes testified at trial to the following:

Hughes arrived at Jo Jo's Lounge after work at approximately 9:45 p.m. on April 24, 1974. His fiancee, Rosetta Showers, was to pick him up at the lounge after she finished work. There were 10 or 15 patrons in the tavern when Hughes arrived. Hughes recited some of their names and described their clothing. As one enters the lounge, a bar is to the left, tables to the right and a bowling machine in the center of the back of the room. Hughes did not know how many lights were over the bar or in the ceiling, but he did not consider the tavern lighting dim. Moreover, there was a bright light on the bowling machine. When Hughes entered, he went directly to the bowling machine. He had nothing to drink that evening.

Approximately five or 10 minutes after his arrival, while he was standing near the bowling machine, a "short man" (not otherwise identified), about five feet two inches or five feet three inches tall, entered. The man had a gun in his right hand and banged an ashtray on the bar as he walked along the bar. The man had very short hair, wore a "green flopped down hat" and wore no coat. Hughes could not recall the color of the man's shirt or trousers. The man had no mustache, but

---

[4] This robbery is unrelated to the case at bar.

[5] The record does not disclose whether any other action in connection with this robbery had occurred between April 24, 1974, and July 8, 1974.

Hughes could not recall if he had sideburns. Hughes could not describe the man's cheekbones, nose or forehead.

Two other individuals were behind the short man. One of them announced, "This is a stickup." Hughes identified defendant and Willie Howell as the two men behind the short man. Both defendant and Howell also held guns. Defendant's gun was blue steel. Hughes recalled that defendant was wearing a red jacket but could not recall the color of defendant's trousers. Hughes could not describe the height of defendant, nor could he recall whether defendant had sideburns. Defendant's hairstyle was the same on the day of the crime as it was at trial, and his face was unshaven. Howell had short slicked down hair, no sideburns and a "little fuzzy, but it's not a mustache." Hughes could not recall the color of Howell's shirt or trousers but did recall that Howell was not wearing a jacket. Hughes described Howell as being approximately five feet nine inches tall.

Defendant and Howell walked to the bowling machine. Although Hughes was ordered to turn around, he still saw the face of defendant. He and the other patrons near the bowling machine were ordered to place their hands on the machine. One of the two offenders then said, "Brother, you can come out of that coat." Howell then picked up Hughes' jacket and removed $29. During this time defendant was three to four feet away from Hughes. Other patrons were also robbed of their valuables.

Howell ordered all of the patrons to move to the rear of the tavern. Defendant was still at Hughes' side. Howell and defendant, with the use of their guns, ordered the male patrons to enter the men's washroom and the female patrons to enter the ladies' washroom. One of the offenders declared, "If you all can't fit into this washroom, I'm going to shoot you right here." Hughes could see defendant's face as Hughes walked from the bowling machine to the washroom. In response to questions from defendant's counsel, Hughes agreed that "[t] here are other people who look like some peoples, but we all don't look alike," and "You know the dogs that bite you."

Hughes had been in the washroom with the other male patrons for about five minutes when he hears a gunshot and then a scream of, "Oh, my God." He recognized the voice as that of Showers. Hughes ran out of the washroom, saw Showers going out of the front door of the tavern and followed her. As he called to her, he saw three men running away.

Joseph Hayes, owner and bartender of Jo Jo's Lounge, testified at trial to the following:

On the evening of the crime, there were approximately 14 patrons in the tavern, including Hughes. A man knocked on the bar with an ashtray. When Hayes approached the man to see what he wanted, the man hit him. The offender pointed a gun in Hayes' face and asked Hayes if he had

a gun. Hayes said yes. The offender placed his gun to Hayes' head and took Hayes' gun from the drawer. The perpetrator then took more than $200. While this was happening, Hayes heard two other men yelling, "This is a stickup, get your money out, hold your hands up" and "Place your hands on the pinball machine." Hayes could not see them. He knew Hughes and another patron were near the bowling machine. The offender who had hit Hayes then ordered Hayes to keep his head straight and to enter the men's washroom. Consequently, he was unable to positively identify defendant at trial although he said defendant looked familiar to him.

Rosetta Showers testified at trial to the following:

On April 24, 1974, Showers, after leaving work, drove to Jo Jo's Lounge to pick up Willie Hughes, her fiance. She parked her automobile at the front door and took her books into the lounge with her because she was afraid that someone would steal them from the car. As she walked into the tavern a man identified by her as defendant grabbed her around the neck. She turned, looked at him and pushed him away. Defendant grabbed her again, this time by the arm, and pulled her towards the bar. Upon release, she hit the bar and dropped her books. When she turned around, defendant was standing a foot away and was holding a gun.

Although Showers expressed the opinion that the lighting in the tavern was dim, she saw that defendant had a mustache and goatee, wore his hair "straightened and curled" and wore a cap. One of the other offenders was tall and dark; he went to watch the door. The other, a short man, came towards her and unzipped her jacket. Defendant stood behind the short man. Defendant slapped Showers when she resisted the removal of her coat. As a result, her eyeglasses fell. She then slapped defendant, and his gun accidently discharged. Showers screamed, and the offenders fled. Defendant, however, returned to take Showers' "satchel." In the "satchel" were her books, school supplies and a black leather French purse wallet containing her identification and $17. Her rabbit fur jacket was also taken.

Showers chased the offenders down the street. The offenders then got into an automobile and drove away. Showers could not describe the car because her glasses had fallen off when defendant had slapped her. She ran after the car until she could not see it and then ran to an ex-neighbor's house to call the police.[6] By that time Hughes had reached her and they walked back to the tavern. Both Showers and Hughes spoke with police officers who had in the meantime arrived at the tavern.

As they were driving away from the lounge, Showers and Hughes were stopped by police and asked by them if the three young men they had in the back of their police car were the men who had committed the

---

[6]The record does not indicate whether Showers in fact called the police.

robbery. Neither Showers nor Hughes identified them as the offenders. Showers told the police that the men who had robbed her were at least 21 years old, whereas the young men seated in the back of the police car were not more than 16 years old.

The parties stipulated that defendant's date of birth was February 23, 1951. Defendant was 23 years old at the time of the offense.

The following evidence was also adduced at trial:

On July 8, 1974, a lineup was held at Area Two Headquarters. Hughes testified that he positively identified defendant and Howell as two of the men who had robbed him. Showers testified that she positively identified defendant as one of the offenders. Hayes testified that he viewed the lineup but was unable to make a positive identification. Officer Alesi testified that he witnessed the lineup, and he corroborated the above testimony. Hughes testified further that during the summer of 1976, more than two years after the crime, Showers and Hughes were at Sportsman Park. Showers saw defendant and directed Hughes' attention to defendant. Hughes immediately recognized defendant.

Willie Howell, also known as Andrew Howell, testified on behalf of defendant to the following:

Howell had pleaded guilty to and had served his sentence for the instant crime. Howell had never met defendant prior to their arrest on July 8, 1974. He had not seen defendant since that time except for the day of trial. Moreover, Howell had not been subpoenaed to testify at defendant's trial.

Howell testified that his two co-offenders in the instant crime were named "Greg" and "Mouse" (not otherwise identified) and that defendant was not involved. Howell did not know the last names of his co-offenders. Both were deceased at the time of trial. Greg was short in height and Mouse was approximately the same height as defendant. Mouse did all the "touching and talking." Less than $100 was stolen, and Howell did not recall a coat being taken. When the offenders separated, Howell received about $30 in proceeds.

Howell is also known by a third alias, Booker T. Ransom. Aside from the instant conviction, he has also been convicted of burglary and armed violence.

Based on the foregoing, the jury found defendant guilty of both counts of armed robbery, and the court entered judgment on these verdicts. Defendant made an oral motion for a new trial over the State's objection and after the State had requested the specificity of grounds required in a written motion. The oral motion specified several alleged errors. The court denied the motion and sentenced defendant to the Department of Corrections for a term of five to eight years.

## I.

At the outset we shall consider the State's contention that a review is limited to the issues specified in defendant's oral motion for a new trial.

■■ Section 116—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1973, ch. 38, par. 116—1) provides that a written motion for a new trial shall be filed by defendant within 30 days after the entry of a finding or the return of a verdict and shall specify the grounds therefore. This section addresses only post-trial procedure in the trial court; it contains no reference to the waiver rule or to appellate procedure; and it prescribes no consequences for a failure to comply with its terms. (*People v. Sweeny* (1978), 57 Ill. App. 3d 879, 885, 373 N.E.2d 663.) That a post-trial motion for new trial be in writing is not made mandatory by this section. (*People v. Biers* (1976), 41 Ill. App. 3d 576, 578, 353 N.E.2d 389.) Instead our supreme court has held that a general oral motion for a new trial, if not objected to by the State, will preserve for appeal all errors which appear properly preserved on the record. (*People v. Whitehead* (1966), 35 Ill. 2d 501, 503—04, 221 N.E.2d 256; *People v. Flynn* (1956), 8 Ill. 2d 116, 118—120, 133 N.E.2d 257; *People v. Prohaska* (1956), 8 Ill. 2d 579, 583, 134 N.E.2d 799.) A request for specification of grounds in an oral motion will delimit the issues for review to those actually enumerated. (*People v. Parker* (1970), 129 Ill. App. 2d 43, 262 N.E.2d 751 (abstract).) The record discloses that the State objected to defendant's oral motion for a new trial and requested that defendant specify the grounds as required in a written motion. Defendant then stated four grounds for review, namely, the admission of both in-court and out-of-court identification testimony, the admission of the hearsay testimony of Officer Alesi, the limitation of defense counsel's cross-examination of Showers concerning her daily activity as a nurse, and "error in final argument." Thus, our review will be limited by the parameters of the oral motion for a new trial.

## II.

Defendant initially contends that the trial court erred in admitting into evidence both in-court and out-of-court identification testimony. Defendant argues that the photograph taken of him pursuant to his July 1, 1974, arrest was the "fruit" of an illegal arrest and that both in-court and out-of-court identifications were based upon that photograph.

We will first consider defendant's contention that but for the unlawful seizure of his person on July 1, 1974, the subsequent out-of-court identifications of him by Watkins, Showers and Hughes would not have been made. The State argues that the July 1, 1974, arrest was not illegal and was in fact based upon probable cause, and that even if that arrest

was illegal, the illegality did not taint the arrest and subsequent identification testimony of the instant prosecution. The narrow issue presented is whether under the facts and circumstances of this case, the out-of-court identifications of defendant by the victims were a direct result of an exploitation of defendant's allegedly illegal arrest on July 1, 1974.

■█▉ Both the Supreme Court of the United States and the Illinois courts have rejected the "but for" test urged by defendant. Evidence cannot be characterized as "fruit of the poisonous tree" merely because it would not have come to light "but for" the illegal actions of the police. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254; *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *People v. Washington* (1978), 60 Ill. App. 3d 662, 377 N.E.2d 397; *People v. Faulisi* (1977), 51 Ill. App. 3d 529, 366 N.E.2d 1072; *People v. Pettis* (1973), 12 Ill. App. 3d 123, 298 N.E.2d 372.) The test to be applied is whether the evidence has been obtained by "an exploitation of the illegality or by means sufficiently distinguishable to be purged of the primary taint." (*Faulisi*, at 534.) The important considerations in determining whether there has been exploitation are the purpose and flagrancy of the official misconduct. *Brown; Faulisi.*

■█ It is a well-established rule that if the unlawful arrest was purely for investigative purposes, solely to acquire general data regarding defendant, the evidence should be suppressed. (*Davis v. Mississippi* (1969), 394 U.S. 721, 22 L. Ed. 2d 676, 89 S. Ct. 1394; *United States v. Edmons* (2d Cir. 1970), 432 F.2d 577; *People v. Pettis* (1973), 12 Ill. App. 3d 123, 298 N.E.2d 372.) In *Edmons*, FBI agents were instructed to arrest anyone who might have been involved in an altercation with several FBI agents. Defendant was arrested along with several others for failure to have a selective service card. While in custody, defendant was photographed. Agents then identified defendant as being involved in the altercation, and he was charged with assault and interfering with a Federal agent. The court held that the arrest was unlawful and the identification was the fruit of the illegal arrest. The court stated at page 584:

> "When the police, not knowing the perpetrator's identity, make an arrest in deliberate violation of the Fourth Amendment for the very purpose of exhibiting a person before the victim and with a view toward having any resulting identification duplicated at trial, the fulfillment of this objective is [an exploitation of the primary illegality].
>
> We are not obliged here to hold that when an arrest made in good faith turns out to have been illegal because of lack of probable cause, an identification resulting from the consequent

custody must inevitably be excluded. But in a case like this, where flagrantly illegal arrests were made for the precise purpose of securing identifications that would not otherwise have been obtained, nothing less than barring them can adequately serve the deterrent purpose of the exclusionary rule."

Similarly in *Davis* there was a round-up of suspects, and only after defendant was in custody and fingerprinted was there a link between defendant and the crime.

In the case at bar the question is whether the defendant's arrest on July 1, 1974, was a flagrantly illegal arrest made for the precise purpose of securing the identification of defendant. The record shows that on July 1, 1974, defendant was arrested for disorderly conduct after police had stopped an automobile in which defendant was a passenger. The police had observed the automobile leave 1739 West 80th Street just prior to a narcotics raid at that address. The automobile was stopped because it bore Illinois license plates which the police had determined on June 30, 1974, were fictitious. Moreover, the police had been present on June 30, 1974, when the driver of the automobile had made a sale of narcotics. Once the automobile was stopped, the arresting officer began to question the driver. Defendant and the other passenger protested the stop and created a disturbance. A crowd gathered and both defendant and the other passenger were immediately arrested and transported to Area Two Headquarters. Based upon the record before us, we cannot conclude that the police stopped the automobile solely because defendant was a passenger and in order to obtain defendant's photograph.

The record further shows that the routine booking procedure at Area Two Headquarters is to photograph every arrestee. The photograph is taken to identify the arrestee and to indicate the approximate time of arrest. The photographs are filed alphabetically in a filing cabinet. Testimony also shows that some officers keep photographs in their personal files for investigative purposes. The procedure followed at Area Two Headquarters differs from the usual procedure followed by the Chicago Police Department. The procedure followed by the Chicago Police Department is to photograph an arrestee if there is no photograph which has been taken in the previous two years on file with the Bureau of Identification. Although Area Two Headquarters' procedure departs from the usual procedure followed by the Chicago Police Department, the departure does not lead to the conclusion that defendant was arrested solely to obtain his photograph for identification purposes.

■■ ■ Based upon our review of the record, we conclude that the trial court did not err in its finding that defendant's arrest was not a subterfuge to obtain defendant's photograph, nor did the court err in denying the motion to suppress the identification testimony.

## III.

Defendant next contends that he was deprived of his right to have the jury evaluate the identification evidence. Defendant complains of three errors: (1) that the trial judge invaded the province of the jury by making rulings and a comment which indicated his belief that the identification testimony was positive and credible; (2) that plain error occurred when hearsay evidence of out-of-court identifications was admitted as a substitute for, or to bolster, in-court identifications; and (3) that the trial court erred in refusing to allow defense counsel to argue to the jury that they should consider the identification evidence in light of their own observations and experiences in life while allowing the State to so argue, although the State's argument was not based on the evidence.

Preliminarily, we note that defense counsel's cross-examination of the State's identification witnesses, Hughes and Showers, was competent and provided the jury with ample opportunity to properly assess this testimony. During defense counsel's cross-examination, every aspect of the ability of the witness to observe defendant was explored, including the position of the witnesses and defendant, the length of time of observation, the lighting conditions, the sobriety of the witnesses, the description of the three offenders (including defendant) and the ability of the witnesses to describe other patrons. Yet the strong identification testimony of Hughes and Showers was unshaken by this extensive cross-examination.

Defendant first claims that certain rulings by the trial court on objections by the State during defense counsel's cross-examination of the State's identification witnesses were incorrect and, further, that the court expressed an opinion that the identification testimony was credible and positive. The State contends that defendant has waived this issue and further argues that the court properly sustained the State's objections. ▪▪ The record shows that defendant failed to specify these rulings and comment as errors in his oral motion for a new trial. Therefore, defendant has waived this issue. However, even if defendant had not waived this issue, our review of the record shows no reversible error occurred.

During the cross-examination of Hughes by Miss Hillyard, defendant's counsel, the following occurred:

"Q. [by Miss Hillyard] Now, the night of the incident back at Jojo's, did Eugene Price, did this man, who was standing close to you with a gun pointed at you, did he hurt you?

A. No, he did not.

\* \* \*

Q. Now, about how long was this person that you say is Eugene, how long was he standing hear [sic] you?

Mr. Cisco [Assistant State's Attorney]: Object to the form of that question.

The Court: Sustained.

Miss Hillyard [Defense Counsel]: Your Honor, I haven't finished the question.

The Court: You may rephrase.

Miss Hillyard: Q. On the day of the incident, how long was the person that you have claimed is Eugene standing near you?

Mr. Cisco: Objection, Judge.

The Court: Basis.

Mr. Cisco: He's not claiming anything. He's testifying here.

The Court: Rephrase it.

Miss Hillyard: Q. The day of the incident, how long was the person that you believe to be Eugene standing near you?

Mr. Cisco: Objection, same objection, Judge.

The Court: He has identified the Defendant as being that person. Sustained.

Miss Hillyard: Your Honor, may I have a sidebar, please?

The Court: You may ask the next question.

Miss Hillyard: Q. How long was the man that was holding the gun, that you say was holding the gun directly at you in Jojo's the night of the incident, how long was he standing there?

Mr. Cisco: Objection, Judge, same objection.

The Court: Do you understand the question?

The Witness: Yes, I do, Judge.

The Court: Answer it."

During the cross-examination of Showers by Miss Hillyard, defendant's counsel, the following occurred:

"Q. The little man unzipped your jacket * * *
* * *

* * * [A]bout how long did it take him to unzip? How long was he standing in front of you during the time he unzipped your jacket?

A. A couple of minutes maybe.

Q. You looked at him the whole time he was unzipping your jacket?

A. I was looking at him and I was looking at the other fellow, because the other fellow had a gun.

Q. So, the one that unzipped your jacket, did not have a gun?

A. Not that I noticed.

Q. What about the man that was watching the door?

A. I didn't notice.

Q. You didn't see him with a gun?

A. I didn't notice.

Q. So, now, Mrs. Hughes, your testimony is that only one—

Mr. Kane [Assistant State's Attorney]: Objection to the form of the question.

The Court: Rephrase.

Miss Hillyard: Q. Is it your testimony, Mrs. Hughes, that only one man had a gun and you believe that man to be this man sitting here?

Mr. Cisco: Objection, Judge, asked and answered, and as to what she believes.

The Court: Sustained.

Miss Hillyard: Your Honor, this is cross.

The Court: Rephrase.

Miss Hillyard: Q. So, Mrs. Hughes, is it your testimony that only one man had a gun?

Mr. Cisco: Objection, that's not her testimony.

The Court: Witness may answer.

Mr. Kane: Object to the form, Judge.

The Court: You understand the question, Mrs. Hughes?

The Witness: She's asking me for an opinion?

The Court: Right.

Miss Hillyard: Q. I'm asking you, Mrs. Hughes, what you saw?

A. I saw one gun, because it was closest to my face or to my eye level. So I can't be for sure what the other man had, because I was only dealing with the one thing I had seen."

■■ The trial court's remark, "He has identified the Defendant as being that person. Sustained," was a ruling sustaining the prosecutor's objections and explaining the reasons therefor. (See *People v. Morgan* (1963), 28 Ill. 2d 55, 190 N.E.2d 755.) Moreover, the jury was subsequently instructed that the court expressed no opinion on the credibility of any witness. The remark by the court in the instant case much resembles the remark of the court in *People v. Allum* (1967), 78 Ill. App. 2d 462, 223 N.E.2d 187. In *Allum*, defense counsel attempted to impeach the testimony of a prosecution witness by reading from a statement made by the witness at the coroner's inquest. After counsel had read a portion of the statement, the prosecution objected on the ground that no impeachment had yet been shown. The objection was overruled. After a further extensive reading from the statement, the prosecution again made an objection and it was sustained, the trial court stating:

"Counsel, I have given you an ample opportunity to show any substantial deviation. You haven't done it. I suggest you go on with this witness."

The court held that the statement of the trial judge was not of such a

nature to prejudice defendant in the eyes of the jury and result in reversible error. Reversible error is committed only where statements indicating prejudice by the trial court are shown. We find that the trial court's above remark in the case at bar did not indicate such prejudice. ■■ Further, the trial court did not err in sustaining the prosecution's objections. It is well settled that matters such as the form of the questions are largely within the discretion of the trial court. (*People v. Priola* (1946), 395 Ill. 296, 70 N.E.2d 46.) We find no abuse of discretion in this case.

Secondly, defendant contends that reversible error occurred when the trial court permitted Officer Alesi to testify that Hughes and Showers identified defendant at a pretrial lineup because this testimony constituted inadmissible hearsay. The State maintains that the admission of this testimony was proper in light of Hughes' and Showers' strong in-court identifications and their testimony regarding their lineup identifications. The State further contends that Officer Alesi's testimony was not offered to bolster a weak in-court identification or to substitute for an in-court identification.

■■■■ An officer's testimony about a witness' out-of-court identification is admissible, notwithstanding the rule against hearsay, if the declarant is present at trial, testifies to the prior identification and is subject to cross-examination. (*People v. Riley* (1978), 63 Ill. App. 3d 176, 379 N.E.2d 746.) Hughes, Showers and Hayes were present at trial, testified to the prior identifications made by them and were cross-examined. Further, the admission of hearsay identification testimony constitutes reversible error only when it serves as a substitute for courtroom identification or when it is used to strengthen and corroborate a weak identification. If hearsay testimony is merely cumulative or is supported by positive identification and by other corroborative circumstances, its admission, if error, is harmless. (*People v. Smith* (1974), 18 Ill. App. 3d 859, 310 N.E.2d 734; *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364.) Thus, we find that the admission of Officer Alesi's testimony did not constitute reversible error.

Lastly, defendant claims that the State's closing argument was improper for two reasons: (1) the trial court improperly allowed the State to refer to common experiences where defendant was denied the same opportunity; and (2) the State engaged in an in-court experiment which did not compare well with the actual facts adduced at trial. The State maintains that defendant was given a full opportunity to discuss the identification testimony and that the State did not intend by their illustration during argument to recreate conditions surrounding the crime.

During closing argument by Miss Hillyard, defendant's counsel, the following occurred:

"We are alive to have a system that is fair to everyone and I don't

think that it's fair and I'm sure you don't think it is fair, as bad as it is, to have a crime committed against you or me or anybody else, that the wrong person suffer for that crime.

Now, what does "credible" mean? You'll be instructed that you will judge a witness, whether they are credible or not. The word is credible. What does credible mean? They are lying, that they are mistaken. Sure. That's part of it.

You are going to be asked to use your experience as persons living in the community and having friends and going about your business. You are going to be asked to use the knowledge that you have obtained from that. Now, haven't you seen or haven't you done this yourself perhaps, made a mistake in identification? Maybe you thought Sam or George—

Mr. Kane [Assistant State's Attorney]: I'll object to—You are not allowed to put a Juror—

The Court: Sustained.

Miss Hillyard [Defense Counsel]: It's a common occurrence where someone named George will be mistaken for Fred or a girl named Sally is being mistaken for Mary. It's a common experience. It's a psychological experience where you can make a mistake and picking out someone or someone you saw on the street you think is someone else. It happens to many, many people, where they are stopped somewhere in a public place and say, how do you do, and you never saw the person.

Mr. Kane: Objection. I don't know why we object if Miss Hillyard doesn't want to obey the rules of evidence.

The Court: Sustained.

Miss Hillyard: You may not put yourself in the place of the witnesses. You may, however, draw from your own common sense.

Drawing on your common experience, I think you can recall as many people can recall that this has happened to them many, many times.

When you were being asked questions before you served on the Jury, they said that every person in the United States who is accused of a crime is presumed innocent. It's really common knowledge. There are times when a man has served in the Penitentiary and turns out that that man has not been guilty. It's been in the papers. We have all seen that.

Mr. Cisco [Assistant State's Attorney]: Object.

The Court: Sustained.

Mr. Kane: Ask the Jury be instructed to disregard it.

The Court: The Jury will be instructed to disregard.

Miss Hillyard: Your Honor, it's true.

Mr. Kane: Ask Miss Hillyard's comment be stricken and the Jury instructed to disregard.

The Court: So ordered.

Miss Hillyard: Now, Mr. Hughes said the man never forgets the dog that bites him. * * * Can it be that a person doesn't forget being bitten, but might make a very serious mistake as to who did the biting?"

In rebuttal, the State argued:

"She [Miss Hillyard] talks about the identification of the Hugheses. You remember her cross examination of Willie Hughes? Remember her cross examination of Rosetta Showers Hughes? They went into the description, what did the other men besides Price in a line-up wear? Now, I'll ask you all to look at me. Do not look at your fellow Jurors.

What is the person sitting immediately behind you wearing? What is the structure of the chin to the person immediately to your left? Does the person to your right have sideburns, if that person is a male? You can't answer those questions, can you?

When was the last time you looked at each other? Not moments ago, before you came out here, you sat around that table in the back and you all looked at each other, and I'm sure you conversed back there.

Miss Hillyard: Your Honor, the Defense was not allowed to bring Jury into the case personally.

Mr. Cisco: May I please argue?

The Court: Counsel is referring to identification. He may comment in that regard.

Mr. Cisco: Now, you can't answer those questions for me, but that's what Miss Hillyard was attempting to do in her cross examination, to raise those issues.

The defensnt [sic] Eugene Price would have you believe these people made a mistaken identification, because they couldn't tell you what the Number One in the line-up was wearing, or what the nose structure of that individual was like.

How could you? You are looking at my nose structure? What is it like? How many people could you describe my nose structure to? Would you know what to say? Unless you are involved in medicine or anatomy, I don't think you can. They are ridiculous questions.

The lady couldn't answer those questions and the man couldn't answer those questions, but they weren't shaken in their testimony. They weren't shaken about the fact they saw Price * * *."

■■ From our review of closing arguments we do not conclude that

defense counsel was foreclosed from arguing ordinary mistaken identity. Indeed, counsel turned to defendant's advantage the testimony of Hughes that a person knows the dog that bites him by arguing, "Can it be that a person doesn't forget being bitten, but might make a very serious mistake as to who did the biting?" Moreover, the jury was instructed to consider all evidence in light of their own observations and experiences in life.

■■ A review of the prosecutor's argument demonstrates that it did not attempt to recreate the conditions of the crime nor the conditions surrounding the lineup, and thereby did not exceed the bounds of fair argument. Therefore, we conclude that no reversible error resulted.

## IV.

Defendant next contends that he was denied his right to a fair trial because the jury may have inferred from testimony that he had committed offenses other than those with which he was charged. The State argues that defendant has waived this issue and further argues that defendant was not prejudiced by a "mere inference of a suspicion" that he had committed offenses other than those with which he was charged.

On direct examination, Officer Alesi testified regarding the July 8, 1974, lineup identifications of Hughes, Showers and Hayes. No mention was made of other individuals who viewed the lineup. On cross-examination, defense counsel engaged in the following line of questioning:

"Q. Now do you know if any other persons were called to the lineup?

A. I believe there were three, two other people that were called.

Q. That's all, just two?

A. That was the total of five people that viewed the lineup.

Q. Five people viewed the lineup. Who else viewed it?

A. Mr. Louis Watkins, and a man by the name of Jones, I believe."

Defense counsel further asked:

"Q. How did you know who to ask to the station to show the lineup to?

A. We had a crime pattern involving—."

Defense counsel interrupted and objected to the answer as being unresponsive because she had wanted an answer referring to police reports. When the court ruled that the answer was responsive, the question was withdrawn.

On redirect examination, the State elicited the following testimony:

"Q. Did your investigation determine whether or not they [Watkins and Jones] were present at JoJo's Lounge on the night of the robbery?

A. Mr. Watkins was a victim of another similar crime.

Q. So Mr. Watkins wasn't in JoJo's Lounge, is that correct?

A. To the best of my recollection, he wasn't.

Q. And Mr. Jones wasn't in JoJo's Lounge either, was he?

A. No, sir, not that I recall."

■■ Defendant's oral motion for a new trial did not include, either specifically or generally, these alleged errors. Moreover, no objection was made at trial to the officer's answer on redirect examination, nor was a motion to strike made. Thus, defendant has waived his right to raise this issue on appeal. See *People v. Nelson* (1973), 12 Ill. App. 3d 67, 298 N.E.2d 256.

■■ ■ We note, however, that even if defendant had not waived this issue, the references to "a victim of another similar crime" and "a crime pattern" could not have affected the jury's verdict since the testimony of the complaining witnesses is so overwhelming as to preclude any possibility of prejudice to defendant. As the supreme court has stated:

"It is not our policy to reverse a judgment of conviction merely because error has been committed, unless it appears that real justice has been denied or that the verdict of the jury may have resulted from such error." (*People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E.2d 347, 350.)

In addition, if defendant procures, invites or acquieses in the admission of evidence, even though it be improper, he cannot complain. Furthermore, a trial court is not obligated to exclude improper evidence where defendant makes no objection, does not move to exclude it or does not disclaim the answers. *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364.

■■ Subject to exception, it is generally the rule that evidence of a distinct substantive offense, or evidence which tends to mislead or prejudice the jury, cannot be admitted in a prosecution for a different offense. (*People v. Ciucci* (1956), 8 Ill. 2d 619, 137 N.E.2d 40.) When evidence of prior criminality is not direct, but merely inferential, the determinative issue is the probative and prejudicial effect of the nexus between the admitted and prior criminality. *Coleman.*

■■ In the case at bar there was no evidence before the jury that defendant had been arrested and charged with any crime other than the one the jury was considering. The jury only knew that there had been a "crime pattern" and that defendant had been charged with the instant robberies. There was nothing before them to suggest that defendant had been identified as one who had committed a second crime. As such, there was no direct evidence of actual prior criminality but only an inference of a suspicion. Furthermore, we have an isolated instance of a remark by a police officer, which may or may not have been intentionally made to

influence the jury. The statement was not elaborated upon and a reading of the record does not disclose an effort by the prosecution to exploit the statement, nor an effort to create an image of defendant as one with criminal tendencies who was likely to commit the crime with which he was charged. It should also be noted that the State's purpose on redirect examination was to rebut any inference that the other two individuals who viewed the lineup on July 8, 1974, had been patrons of the tavern on April 24, 1974, but had failed to effect an identification or had identified someone other than defendant. Thus we conclude that no reversible error resulted.

## V.

Defendant contends that the prosecution during both cross-examination and closing argument improperly discredited the testimony of defense witness Willie Howell by misrepresenting to the jury that Howell was immune from prosecution for perjury. The State argues that the prosecutor's remarks could not have been interpreted by the jury to mean that Howell was immune from prosecution for perjury since the comments referred solely to the State's inability to prosecute Howell twice for the same armed robbery.

During the State's cross-examination of Howell, the following occurred:

"Q. You know we can't do anything to you for this charge, don't you?

A. Wait a minute.

Miss Hillyard [Defense Counsel]: Can I say something?

The Court: No, you need not answer. Sustain the objection."

During the State's closing argument, the following occurred:

"* * * [T]ake a look at Mr. Howell's bias and prejudice. Here's a man who is convicted of armed robbery. * * * He's convicted of burglary. He's been to the Penitentiary. He knows what goes on in these Courtrooms and he knows how the system works.

Miss Hillyard: Objection, Judge.

Mr. Kane [Assistant State's Attorney]: He knows there's nothing we can do.

Miss Hillyard: Mr. State's Attorney, objection.

The Court: Basis of the objection?

Miss Hillyard: Well, Your Honor, there's been no testimony other than what the jury has heard and the State's Attorney is now making up what Mr. Howell knows or says, and based on something that is not before the Court and before the Jury.

The Court: State may comment on the fact he has been in Court

before. However, what he knows, I wouldn't [*sic*] sustain the objection.

Mr. Kane: He's been in Court before. He's been in Court on many occasions. He's familiar with the procedure. He's familiar with trials. He's familiar with pleas. We cannot do one thing to him for this armed robbery. He's done his time.

Miss Hillyard: Objection, Judge.

The Court: Sustained."

Defense counsel then argued that Howell should be believed because he had pleaded guilty. She rhetorically asked, "Why on earth would he later come and lie to you? Why?" In rebuttal, the State argued that Howell would have a reason to "perjure" himself, namely, to obtain the release of defendant, his partner in crime. The State also argued:

"* * * Why does Howell come here? What can he lose? What's he got to lose? Nothing.

Miss Hillyard: Objection, Judge.

Mr. Cisco: May I please continue, Judge, without these spurious [*sic*] objections?

The Court: You may continue with your argument.

Mr. Cisco: Thank you, Judge. He's been convicted of that crime. He's done his time in the Penitentiary. You can't try a man twice for the same crime.

Miss Hillyard: Objection.

The Court: May comment.

Mr. Cisco: He's been down there. He has absolutely nothing to lose. What does he have to gain? He gets his man back out on the street. That's what he has to gain * * *."

A conviction will not be disturbed on the basis of improper remarks made during closing argument unless it appears that the improper remarks constituted a material factor in the conviction (*People v. Robinson* (1979), 68 Ill. App. 3d 747, 386 N.E.2d 559, citing *People v. Cavanaugh* (1958), 13 Ill. 2d 491, 150 N.E.2d 592) or resulted in substantial prejudice to the accused (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881) or the verdict would have been otherwise had the remarks not been made (*People v. Naujokas* (1962), 25 Ill. 2d 32, 182 N.E.2d 700). A careful review of the record demonstrates that the evidence establishing defendant's guilt was overwhelming. Indeed, defendant does not contest the sufficiency of the evidence against him.

■■ Although the comments would have been better left unsaid, defendant did object to them and the trial court sustained the objections. When a remark is objected to and the objection is sustained, there is no

reason to believe the jury was unduly prejudiced by it. (*People v. Stephens* (1973), 13 Ill. App. 3d 642, 301 N.E.2d 89.) Moreover, the jury was instructed that they consider only the testimony of the witnesses in making their determination of facts, and that neither opening statements nor closing arguments could be considered as evidence. In view of the overwhelming evidence of defendant's guilt, we cannot conclude that the State's cross-examination or closing argument, much of which was comment on the motive and credibility of Howell, influenced the result or that the verdict would have been otherwise had the remarks not been made.

## VI.

Finally, defendant contends that the prosecution in closing argument improperly referred to defendant's failure to testify. The State contends that defendant has waived this issue and further argues that the prosecutor's remarks were not intended to direct the jury's attention to defendant's failure to testify.

Defendant neither objected to the remarks at the time they were made, nor specifically designated them as error in his oral motion for a new trial. However, defendant claims that the remarks constitute plain error and may therefore be considered.

■■ ■ It is well established that failure by defendant to object to an issue at trial or to raise an issue in a motion for a new trial constitutes waiver of that issue. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856; *People v. George* (1971), 49 Ill. 2d 372, 274 N.E.2d 26.) This waiver rule applies to constitutional questions as well as to other issues. (*Pickett; People v. Long* (1968), 39 Ill. 2d 40, 233 N.E.2d 389.) However, Supreme Court Rule 615(a) (Ill. Rev. Stat. 1973, ch. 110A, par. 615(a)) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." This rule does not mandate that a reviewing court consider all errors involving substantial rights whether or not the same have been brought to the attention of the trial court. Rather, the rule is a means of meliorating the harshness of the strict application of the general waiver rule. *Pickett.*

> " 'The court may, as a matter of grace, in a case involving deprivation of life or liberty, take notice of errors appearing upon the record which deprived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved or the question is imperfectly presented.' " (*People v. Burson* (1957), 11 Ill. 2d 360, 370-71, 143 N.E.2d 239.)

Likewise, in criminal cases in which the evidence is closely balanced, the supreme court has held that a court may consider errors that have not

been properly preserved for review. *People v. Bradley* (1964), 30 Ill. 2d 597, 198 N.E.2d 809.

■■ Based upon our review of the record, we do not conclude that defendant was deprived of a fair and impartial trial or was unduly prejudiced by the prosecutor's remarks. Nor do we conclude that the evidence was closely balanced. Moreover, defendant has not contended that he was not proved guilty beyond a reasonable doubt. Therefore, there is no reason to depart from the general rule that issues not properly preserved for review are waived.

■■ We note, however, that the fifth amendment privilege against self-incrimination, as it applies to the States through the fourteenth amendment, forbids comment by the prosecution on defendant's failure to testify on his own behalf. (*Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229.) A direct reference by the prosecution to defendant's failure to testify is prejudicial error for which a new trial must be granted. (Ill. Rev. Stat. 1975, ch. 38, par. 155—1; *People v. Burton* (1969), 44 Ill. 2d 53, 254 N.E.2d 527.) While the prosecution may refer in closing argument to the testimony of its own witnesses and point out that their testimony has not been contradicted, it may not comment in a manner that is " 'intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify * * *'." (44 Ill. 2d 43, 56.) It is permissible for the prosecution to comment on the uncontradicted nature of the State's case even where the only person who could have contradicted the State's evidence was the defendant himself. (*People v. Skorusa* (1973), 55 Ill. 2d 577, 584, 304 N.E.2d 630.) In determining whether statements by the prosecution are improper, the statements must be read in the context of the prosecution's argument. *People v. Asey* (1967), 85 Ill. App. 2d 210, 229 N.E.2d 368, *appeal denied* (1967), 37 Ill. 2d 625.

In the case at bar, the prosecutor made the following statements during the initial portion of the State's closing argument:

> "Basically, that was the State's case. We have two identifications of the Defendant by our victims and then, we have corroboration of the fact there was a robbery, by the owner of the tavern.
>
> The last witness you heard was the sole witness called by the Defense, and that was Mr. Howell, Andrew Howell, I believe it is. Now, I would like to contrast his testimony, his demeanor, his background, with that of the two people you saw identify the Defendant * * *."

During the rebuttal portion of the State's closing argument, the following was said:

> "* * * The State's case was short, four witnesses, three people

from the tavern and an Investigator. Miss Hillyard's [defense counsel's] job was to present to you what her theory of the testimony was or to comment on what she believed the evidence did or did not show.

It's my job to stand up here now and address you, to comment on those points or ideas or thoughts raised by Miss Hillyard. I'd indicate to you the evidence that has been presented to this Court to you as Jurors stands before you completely and totally uncontradicted, except for one thing. The man who sits in the back of the Courtroom back there, Mr. William Howell, the convicted armed robber, the convicted burglar * * *."

■■■ Defendant contends that the comments "sole witness" and "uncontradicted except for" were purposeful, therefore impermissible, comments on defendant's failure to testify. The remarks constituted an accurate summary of the evidence presented and were not intended to circumvent the proscription against comment on defendant's failure to testify. In both instances the prosecution briefly listed the witnesses which it had called, cited the fact that defendant had called one witness and then quickly proceeded to evaluate that witness' testimony and credibility. We conclude that these comments were not "calculated" to draw attention to the fact that defendant failed to testify.

Based upon the foregoing we affirm the judgment of the circuit court of Cook County.

Affirmed.

STAMOS, P. J., and DOWNING, J., concur.